## EX PARTE CRANDALL—HABEAS CORPUS.

The Revenue Law of the State imposing a capitation tax of one dollar on all passengers carried out of the State by stage companies, is not a regulation of commerce among the States, nor a tax on exports, and is not in conflict with the powers of the Federal Government.

There is no restriction upon the taxing power of a State, except the laying of imposts or duties on imports or exports, and if in the exercise of this power foreign commerce, or commerce among the States be incidentally affected, the State authority must nevertheless be maintained.

The power to regulate commerce is not exclusive in Congress, but concurrent in the Federal Government and the States. No State law upon the subject will therefore be unconstitutional, unless in direct collision with some law or regulation of Congress. The power is exclusive in Congress only so far as it is exercised by it.

The mere grant of power to the General Government does not necessarily imply a prohibition upon the States.

The words "imports" and "exports" as used in the Federal Constitution, include property only and do not extend to individuals.

The tax of one dollar levied on passengers leaving the State is not a poll tax, and does not conflict with the constitutional provision limiting the poll tax to four dollars.

This was an application for writ of *habeas corpus* made originally to the Supreme Court.

*Williams & Bixler* and *Chas. E. Flandrau*, for Petitioner.

The most important question involved in this case is, whether section 90 of the Revenue Law of this State, approved March 8, 1865, is in conflict with any of the provisions of the Constitution of the United States. If so, it is void, and the proceedings had under it must fall in such conflict.

We claim that the section mentioned violates that subdivision of Section 8, Article I. of the Constitution of the United States, which declares that the Congress shall have power " to regulate commerce with foreign nations, and among the several States, and with the Indian tribes;" and also, that subdivision of Section 10, same Article, which declares that "no State shall without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

Section 10 of the Revenue Act cited provides that " there shall be levied and collected a capitation tax of one dollar upon every person leaving this State, by any railroad, stage

Ex Parte Crandall—Habeas Corpus.

coach or other vehicle, engaged or employed in the business of transporting passengers for hire," to be paid by the person or company owning the road, coach or vehicle.

The first question arising is, whether the section quoted is a regulation of commerce between this and the other States, or between this State and foreign countries, and if it is, then whether the State can exercise that power.

"Commerce," as used in the Constitution of the United States, in its most comprehensive sense, means *intercourse* between this Government and foreign countries and among the several States. The term is not confined merely to traffic, but embraces all and every species of commercial intercourse in all its branches. (Story on the Constitution, vol. 2, secs. 1061, 1062, 1064, 1065.)

It embraces the transportation and carrying of persons as well as goods. (7 Howard U. S. pp. 401–5–7–8–12–13.)

We think the language of the 10th section of the Revenue Act comes within the meaning of the term "commerce," as used in the Constitution, and that it is unquestionably an attempt to regulate the transportation of persons from this to other States and foreign countries. It is immaterial that it purports to levy a capitation tax upon persons within the State, it is nevertheless a tax upon personal intercourse between persons of this State and other States of the Union and foreign countries, and by the terms employed, the form is merely varied without affecting the substance. (*Almy* v. *State of California,* 24 Howard U. S.; *Lin Sing* v. *Washburne,* 20 Cal. 570.)

This is a question of power, and if the Legislature has the power claimed to tax persons leaving the State, whether citizens or not—no distinction being made in the Act—then it has the power to tax them for coming into it; and having the power to do either or both, it can prohibit all intercourse.

Assuming, then, that the Act is a regulation of commerce, the Court will consider whether the State can exercise that power. We claim that it cannot, because the power is exclusively in the Congress. (2 Story on the Constitution, secs. 1067–1071, and note 1 to p. 23, 3d edition; 7 Howard U. S. pp. 393–94–96–410–11; *People* v. *Downer,* 7 Cal. 169, and 20 Cal. 535.)

We also claim that the Revenue Act under consideration is in direct violation of that part of section 10 of the Federal Constitution quoted.

The word "impost" embraces any tax, duty or tribute laid by Government, and "export," as used in the section of the Constitution referred to, includes persons as well as property. (2 Story on the Constitution, sec. 1072 ; 7 Howard U. S. 414, and sec. 9, Constitution of the United States ; 1 Kent, 404.)

It is not claimed here that the Congress has consented to the enactment made by our Legislature, or that it was made to execute our inspection laws.

If, then, we are correct in holding that the Act lays an "impost" upon "exports," its nullity necessarily follows, because such Acts are expressly prohibited by the Federal Constitution.

In conclusion, we call attention to a provision of our State Constitution which we think the 10th section of the Revenue Act violates.

If the Court holds against us upon the points made in reference to the National Constitution, then we ask a consideration of the point now suggested but not intended to be argued.

The Revenue Act declares the tax which we are contesting a capitation tax, and levies it upon all passengers without any reservation or distinction.   Section 7, Article II. of the State Constitution limits the capitation tax to four dollars upon all male residents of the State.

Section 43 of the Revenue Act levies a poll or capitation tax upon each male inhabitant of the State under sixty and over twenty-one years of age, thereby exhausting the power conferred by the Constitution, so far at least as the persons named are concerned.   And again, having named a class upon whom a poll may be levied, it is worthy of consideration whether all others are not excluded.   "*Expressio unius est exclusio alterius.*"

*Geo. A. Nourse*, Attorney General, for Respondent.

A statute should never be declared unconstitutional by the Courts unless it be *clearly* repugnant to the Constitution.  (12 Cal. 384, *People* v. *Burbank ;* 12 Wheat. 270, per Washington,

J.', and a very large number of cases cited in U. S. Digest, vol. 1, p. 553, Constitutional Law.)

The law in question is not in conflict with that clause of Section 10 of Article I. of the Constitution of the United States, which provides that "no State shall, without the consent of Congress, lay any imposts or duties · on imports or exports," etc., in that, *persons* carried out of the State are not "exports" within the meaning of this clause.   An export is a "thing exported," not a *person.*   (12 Wheat. 438, *Brown* v. *State of Maryland*, per Marshall, C. J.; 11 Pet. 102, *City of New York* v. *Miln*, see p. 136–7; 5 How. 594, License Cases, per McLean, J.)

Nor is the law in question in conflict with the provisions of that clause of Section 8 of Article I. of the United States Constitution, which says that "Congress shall have power * * * to regulate commerce among the several States," etc., in that this grant of power has never yet been exercised by Congress.

Said grant of power, while thus dormant and not exercised by Congress, does not deprive the several States of the power to regulate commerce among themselves which confessedly belonged to them before the adoption of the Constitution of the United States.

In all the decided cases where analogous laws of the several States have been held unconstitutional, it has been because of their alleged conflict with laws actually enacted by Congress under the power given that body by the Constitution "to regulate commerce with foreign nations * * * and with the Indian tribes."   In such case, of course the State law must go to the wall, under Section 2 of Article VI. of the United States Constitution.   (9 Wheat. 1, *Gibbons* v. *Ogden*, per Marshall, C. J., p. 200; 5 Wheat. 1, *Houston* v. *Moore*, per Washington, J., p. 21—per Storey, J., p. 49; 2 Pet. 246, *Wilson* v. *Blackbird Creek Marsh Company*, per Marshall, C. J., p. 252; 12 Wheat. 419, *Brown* v. *State of Maryland*, per Marshall, C. J., p. 448; 11 Peters, 102, *City of New York* v. *Miln*, per Barber, J., delivering opinion of Court, pp. 134, 135, 136, 139, 140, 141—per Thompson, J., pp. 145, 146, 151; 5 Howard, 504, License Cases, per Taney, C. J., pp. 574, 578–9,

580–1–2–3–4–5–6; Ib., 607, 618; per Catron, J., 607; per Nelson, J., concurring with Taney, C. J., and Catron, J.; Ib., 618, per Woodbury, J., pp. 618, 619, 624–5.)

So even if the law in question were intended purely as *pro tanto* a regulation of commerce among the States, it would still not be in violation of the constitutional provision last cited.

But even if it would be in violation of said constitutional grant of power to Congress to regulate commerce among the States for the State to make regulations of commerce between this and adjacent States, still the law in question is not unconstitutional, because

The law in question is evidently not intended as such commercial regulation, but entirely *as a tax* for the support of the State Government. A law thus passed entirely *diverso intuitu* does not become a regulation of commerce merely because in its operation it may bear indirectly upon commerce. (9 Wheat. 201–2–3–4, per Marshall, C. J.) The power of taxation is (like the police power) indispensable to the existence of a State Government, and has never been claimed to be impaired by any clause of the United States Constitution, except so far and in such respects as that instrument *expressly* prohibits it. To take away that power *by inference* would be to open the way for entire destruction of State Government. No State tax has ever been held unconstitutional by the Supreme Court of the United States, unless expressly prohibited by the United States Constitution, or in conflict with a law of the United States made in pursuance thereof. (9 Wheat. 199, per Marshall, C. J.; Ib., 210, 211, per Marshall, C. J., and the cases generally cited *ante;* 4 Wheat. 316, *McCulloch* v. *State of Maryland,* pp. 427–8, 436; 11 Pet. 102, *City of New York* v. *Miln,* pp. 133, 137–8–9.)

The exercise of this taxing power in the present instance, not being expressly prohibited by the United States Constitution, nor in conflict with a law of the United States "made in pursuance thereof," is thus the exercise of a right universally conceded to have originally belonged to the several States, of a right which the authorities agree has never been surrendered by the States, and is not in conflict with any United States law.

The position that the law in question conflicts with Section 7 of Article II. of the Constitution of the State of Nevada, was not claimed by counsel for petitioner to be entitled to much weight. It seemed to be put forth upon the idea that if it were shown that the law in question is *almost* in violation of the United States Constitution, and also, *almost* in violation of the State Constitution, the Court might put the two together and hold the law *quite* void.

We say that the law does not conflict with said last named provision of the State Constitution, because said section of the State Constitution provides that the Legislature " shall provide by law for the payment of an annual poll tax of not less than two, nor exceeding four dollars from each male person resident in the State," etc.

The tax in question is not a poll tax, nor can it be made so by being described by law as a " capitation tax." It is not levied on, nor paid by the passenger himself, but is paid by the common carrier at the rate of so much for each passenger carried by him. It is as strictly a tax on his business, graduated by the amount of such business, as is the license tax required of bankers and brokers, under sections 59, 60 and 61 of the same Act, which varies *pro rata* with the amount of business done by them. (Section 91 of Revenue Act.)

Nor does it become a poll tax by falling ultimately upon the passenger carried, any more than does the tax upon whiskey become a poll tax because ultimately paid by him who drinks the whiskey. It remains a tax upon the business, whoever pays it at last.

Opinion by LEWIS, C. J., full Bench concurring.

It is provided by the 90th section of the Revenue Act of 1865, that "there shall be levied and collected a capitation tax of one dollar upon every person leaving this State by any railroad, stage coach or other vehicle engaged or employed in the business of transporting passengers for hire, and every person, firm, corporation or company owning or possessing or having the care or management of any railroad, stage-coach or other vehicle engaged or employed in the business of trans-

porting passengers for hire, shall pay in the manner as herein provided to the Sheriff, as *ex officio* License Collector of the several counties within this State, the said tax of one dollar for each and every person so conveyed or transported from this State."

Section 91 declares that "for the purpose of collecting said tax every such person, firm, corporation or company, their agent or agents, shall make a statement under oath to the Sheriff or other officer authorized to collect said tax, of the number of passengers so conveyed or transported from the State by any railroad, stage-coach or other vehicle owned by him or them, or under his or their control or charge, on the first Monday of each month for the preceding month, and shall pay over to the Sheriff or other officer the capitation tax as provided in this Act for each passenger so conveyed or transported, which tax shall be paid in the county from which such passenger shall be conveyed or transported."

For the purpose of enforcing the observance of these provisions of the law, it is made the duty of all Justices of the Peace, to whom complaint may be made, to issue a citation ordering any party or parties refusing to make the statement required by section 91, to appear forthwith before the Justice issuing such citation, and answer upon oath concerning the number of passengers conveyed or transported out of the State from that point or place for the preceding month; and such Justices are also authorized, in case of refusal so to answer, to commit such person or persons for contempt.

The petitioner being the agent of the Pioneer Stage Company at Carson City, was required by the Sheriff of Ormsby County to make statement of the number of passengers conveyed out of the State by that company in the month of April, A. D. 1865. Having refused, the proper proceedings were had, a citation issued, and upon his refusal to answer before the Justice, he was regularly committed for contempt, and he now appears before this Court upon *habeas corpus*, demanding his discharge upon the ground that that portion of the revenue law levying this tax is unconstitutional and void.

All other questions being expressly waived by counsel, the constitutionality of the law alone will receive our consideration.

Questions as to the relative powers of the General Government, and the several States have, from the foundation of the Union, been as prolific in forensic discussions and judicial investigation as in political divisions.

And no feature in the history of those controversies is more prominent than the open reluctance which the State Courts have ever manifested in deciding against the authority of the States. Whilst in many cases, perhaps, political sentiments may have given color to their decisions, yet it must be acknowledged that there are weighty reasons in support of the general policy which they have pursued upon such questions.

A proper respect for the opinions of those composing the co-ordinate branches of the Government is often in itself sufficient to outweigh a doubtful opinion entertained by the Court. The fact also that no appeal can be taken from the decision of the highest Court of a State in questions of this character, where its decision is against the authority of the State, and in favor of the General Government, is certainly no insignificant consideration, neither should the necessities of the State, the nature of the authority exercised, nor the object sought to be attained be overlooked. If the authority exercised, or the laws enacted be dictated by a wise policy or an imperious necessity, and the welfare or safety of her people is promoted thereby, the Court which would be reluctant in depriving her of the one, or annulling the other, should need no apology.

Nor have the considerations favoring a liberal construction of Federal powers much weight in cases of this kind, for it is obvious to all that the powers of the General Government are not necessarily augmented by derogating the authority of the States. They may be deprived of powers by their own Courts upon the plea of repugnancy to some authority of the General Government, which authority that Government may never recognize in itself, or if recognized, never exercise. Thus paralyzing the powers of the States and depriving them of sovereign and indispensable authority without conferring the shadow of power upon the General Government, and producing the unhappy result of a State without the power and a Congress without the disposition to legislate upon subjects of vital importance to the people. Whilst we believe the supre-

macy of all constitutional laws and regulations of the General Government should be cheerfully recognized, and the decisions of its Supreme Court determining its authority accepted as final and controlling, care should be exercised that those powers essential to the welfare and prosperity of the State should not be unnecessarily relinquished.

No power, perhaps, is more essential to secure the great end of Government than a full and unrestricted power of taxation ; and as a total deprivation of that power would result in inevitable and hopeless ruin, so every restriction upon, or derogation from it, proportionately diminishes the power of the State to maintain itself. And as the power and prosperity of the States directly enhance the glory and augments the power of the General Government, so weakness and poverty must necessarily produce the opposite results. All considerations, then, outside of the immediate questions in this case are certainly in favor of sustaining the law of this State.

The first point made in the argument of this case is that the law imposing the capitation tax of one dollar upon passengers leaving the State, is in conflict with the power of Congress to "regulate commerce with foreign nations, and among the several States and with the Indian tribes," and also that it is repugnant to that provision which declares that "no State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

It is not claimed that the Revenue Act conflicts with any law of Congress passed under its authority to regulate commerce, but it is insisted that that power is exclusive in Congress, and any exercise of it by a State is repugnant to its authority over the same subject.

Waiving, for the present, the question of whether the Constitution vests all power of legislation upon the subject exclusively in Congress, we will direct our inquiries to the question of whether this Act of the Legislature can be considered a regulation of commerce. We think not. Though it may, perhaps, incidentally or indirectly affect commerce between the States, it is evident the Legislature had no intention of legislating for the regulation of commerce, nor of interfering with

the power of Congress to do so ; but in the exercise of a power unquestionably vested in it, a burden is perhaps placed upon the commerce among the States. Can it, however, be said that every Act of a State Legislature, which remotely or incidentally affects commerce between the States, is unconstitutional ? If so, every Act which a State may adopt imposing taxes upon its citizens or the property within its jurisdiction must be unconstitutional ; for no tax can be imposed upon property which will not in some way affect commerce, not only between the States, but also with foreign countries.

All taxes upon imported goods must in some degree affect their importation, and yet that a State may tax such goods (after they have left the possession of the importer) to an extent which would even result in a total prohibition of their importation, there is no doubt. So a State may require a license to sell goods imported from another State, and may prohibit all sales except by those having a license (License Cases, 5 How. 573), and yet the direct effect of such a regulation would be to decrease the importation of such articles, but as said by Mr. Justice McLean, in the cases above cited, "still it is clear that a law of a State is not rendered unconstitutional by an incidental reduction of importation." And indeed it seems to be well settled upon the weightiest authority, that there is no restriction upon the taxing power of the State, except the laying of imposts or duties on imports or exports, and if, in the exercise of this power, foreign commerce or commerce among the States be incidentally affected, it cannot be said to be a regulation of it, and the State authority must be maintained. This is the doctrine maintained by many of the framers of the Federal Constitution, and by many of its most able expounders. Mr. Hamilton, in the thirty-second number of the *Federalist*, says : " I am willing here to allow in its full extent the justness of the reasoning which requires that the individual States shall possess an independent and uncontrollable authority to raise their own revenue for the supply of their own wants. And making this concession, I affirm (with the exception of duties on imports and exports) they would, under the plan of the Convention, retain that authority in the most absolute and unqualified sense." And in the case of *McCul-*

*loch* v. *The State of Maryland*, 4 Wheat. 428, Chief Justice Marshall says: "It is admitted that the power of taxing the people and their property is essential to the very existence of Government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the Government may choose to carry it. The only security against the abuse of this power is found in the structure of the Government itself."

The very prohibition that no State shall lay any impost or duty on imports or exports, is itself a strong implication that as to all other taxes the authority of the State remains unrestricted. Chief Justice Taney, in his dissenting opinion in the Passenger cases, says: "I may, therefore, safely assume that, according to the true construction of the Constitution, the power granted Congress to regulate commerce, did not in any degree abridge the power of taxation in the States.    *    *    * They are expressly prohibited from laying any duty on imports or exports, except what may be absolutely necessary for executing their inspection laws, and also from laying any tonnage duty. So far their taxing power over commerce is restrained, but no farther." And in the case of *Livingston* v. *Van Ingen*, Chancellor Kent makes use of the strong language that "the States retain the same absolute powers of taxation which they possessed before the adoption of the Constitution, except the power of laying an impost which is expressly taken away. This very exception proves that without it the States would have retained the power of laying an impost; and it further implies *that in cases not excepted* the authority of the States remains unimpaired." If, then, the passengers conveyed out of the State be not comprehended within the term "export" (as they certainly are not), the levying of the tax upon them while within the jurisdiction of the State is the legitimate exercise of a power which the State unquestionably possesses.

But it is said, if the State has the power to levy this tax, it may be so exercised as to prohibit all emigration from the State. True, but that would be an abuse of power, and it is illogical to argue from its abuse against its existence. So a State might impose taxes so burdensome upon imported goods as to prohibit their importation; it is, nevertheless, settled

beyond a doubt that it may do so.   If, however, it is admitted that the Act of the Legislature is a regulation of commerce, it is a complete answer to the position of counsel for the petitioner that the State law does not conflict with any Act or regulation of Congress, and the power to regulate commerce being concurrent in the States and the General Government, the State may pass any law regulating it within its jurisdiction not conflicting with some law of Congress.   The concurrent power of the State, however, being subordinate to that of the General Government, its laws must yield whenever they conflict with any Act of Congress regulating the subject.   We are aware that a great diversity of opinion has existed and still exists upon this perplexing question, and that some of the ablest Judges who have graced the jurisprudence of our country have entertained opposite opinions upon it.   And though it has often engaged the attention of the Courts, it cannot be said to be free from doubt and uncertainty; the weight of authority and force of reasoning, however, certainly seems to be in favor of the doctrine that the power is exclusive in Congress only so far as it is exercised by it.   That a State law is not unconstitutional because repugnant to the dormant power in Congress to regulate commerce.

The mere grant of power to Congress cannot by any reasonable construction imply a prohibition upon the States.   If so, why are many of the powers expressly granted to Congress prohibited to the States in the same instrument?   Indeed, nothing seems more evident than that the framers of the Constitution did not so intend it.   If they did they may be charged with having introduced numerous useless and objectless provisions into it, which is an assumption not to be tolerated.   It is apparent from the whole tenor of the Constitution that the object was to rest some powers exclusively in the general Government, and to leave others to be concurrently exercised by it, and the several States.   The power is granted to the Federal Government " to grant letters of marque and reprisal," " to coin money," and to make treaties," and yet by Section 10, Article I. of the Constitution, these same powers are expressly prohibited to the States.

If the grant of such powers implied a prohibition upon the

States, why this express prohibition of some of them? True, there are powers granted, which from their very nature become exclusive. Any power growing out of the Federal Union and not possessed by the States before the adoption of the Constitution are necessarily exclusive. As, for instance, Congress has power to borrow money on the credit of the United States, to constitute tribunals inferior to the Supreme Court, and to make rules for the goverment of the land and naval forces.

These are powers resulting directly from the union of the States, and cannot be exercised by any one of them. But where the authority is one vested in the States before the adoption of the Constitution, and it is not directly repugnant to, or incompatible with, a similar power granted to Congress, it is not exclusive and may be exercised concurrently by both Governments, unless the granted power be in express terms made exclusive, or its exercise is prohibited to the States. And with the qualification always, that when the laws of a State and of Congress conflict, or the State law is repugnant to any law of the General Government, that of Congress, being the supreme law of the land, must prevail.

There are many powers granted to Congress, the exercise of which is indispensable to the safety and welfare of the States, and which have never been exercised by Congress. The power to establish uniform laws on the subject of bankruptcy throughout the United States; to fix the standard of weights and measures; to provide for organizing, arming and disciplining the militia, are granted to Congress, and yet the right of the States to exercise the same powers has been always recognized and never seriously questioned. In the case of *Houston* v. *Moore*, 5 Wheat. 1, the Supreme Court of the United States held that the grant of power to the Federal Government to provide for organizing, arming and disciplining the militia did not preclude the States from legislating on the same subject, provided the law of the State is not repugnant to the law of Congress. So, too, in the case of *Sturges* v. *Crowninshield*, 4 Wheat. 196, it was held by the same Court that a State might legislate upon the subject of bankruptcy, notwithstanding the power is granted to Congress to pass uniform laws on the subject. It would be rather difficult, we apprehend, to give any

substantial reason why these powers should be concurrent, and the power to regulate commerce exclusive. There is nothing in the form of the grant, and certainly there seems to be nothing in the character of the powers, which would authorize a rule in the one case not applicable in the other. If not, these cases directly sustain our views upon this question. In the early history of the Constitution this was the prevailing doctrine among the ablest advocates for its adoption. In the 32d number of the *Federalist* it is said that "notwithstanding the affirmative grants of general authorities, there has been the most pointed care in those cases where it was deemed improper that the like authorities should exist in the States, to insert negative clauses prohibiting the exercise of them by the States." In the same number, Mr. Hamilton says that there are only three cases in which the State authority is alienated: 1st, where the grant to the General Government is in express terms exclusive; 2d, where the like power is expressly prohibited to the State; and 3d, where an authority in the States would be absolutely and totally contradictory and repugnant to one granted to the Union. In the case of *Livingston* v. *Van Ingen*, 9 Johns. p. 507, Chancellor Kent, in delivering the opinion of the Court, says: "The powers of the two Governments are each supreme within their respective constitutional spheres. They may each operate with full effect upon different subjects, or they may, as in the case of taxation, operate upon different parts of the same subject. * * * We have nothing to do in the ordinary course of legislation with the possible contingency of a collision, nor are we to embarrass ourselves in the anticipation of theoretical difficulties, than which nothing could in general be more fallacious. * * * * One safe rule of construction and of action is this: That if any given power was originally vested in the States, if it has not been *exclusively* ceded to Congress, or if the exercise of it has not been prohibited to the States, we may then go on in the exercise of the power until it comes practically in collision with the *actual exercise* of some Congressional power."

Mr. Justice Thompson, in the same case, says: "But it is obvious that the mere grant of a power to Congress does not

necessarily vest it exclusively in that body." So this construction has been repeatedly recognized by many of the Judges of the Supreme Court of the United States; and the Court itself, in the case of *Wilson* v. *The Blackbird Creek Marsh Company* (2 Pet. 245), expressly declared this to be the correct doctrine even in the case of the commercial power. We would feel satisfied to rest this question upon the authority of that case were it not for the fact that some of the Judges of the same Court have subsequently attempted to repudiate the rule there adopted. That case arose upon a privilege granted by the Legislature of Delaware to the plaintiff to construct a dam across a navigable creek through which the tide ebbed and flowed. The question was directly raised as to whether the Act of Delaware was in conflict with the power of the United States to regulate commerce, and the Court expressly passed upon it. In delivering the opinion, Chief Justice Marshall said: "If Congress had passed any Act which bore upon the case, any Act in execution of the power to regulate commerce, the object of which was to control State legislation over those small navigable creeks into which the tide flows and which abound throughout the lower country of the middle and Southern States, we should feel not much difficulty in saying that a State law coming in conflict with such an Act would be void. But Congress has passed no such Act. The repugnancy of the law of Delaware to the Constitution is placed entirely in its repugnancy to the power to regulate commerce with foreign nations and among the several States—a *power* which *has not been so exercised* as to affect the question. The Act is not in violation of this power in its dormant state." The question again came up before that Court in the License Cases (5 Howard, 514), and the doctrine is reiterated and sustained by a power of reasoning which ought to have settled the question in that Court at least; but in subsequent cases which have been before it, a different rule is laid down by some of the Judges, and it is claimed that it has been established by the Court.

In *Thurlow* v. *The Commonwealth of Massachusetts*, Mr. Justice McLean says: "The acknowledged police power of a State extends often to the destruction of property. A nuisance

may be abated. Everything prejudicial to the health and morals of a city may be removed. Merchandise from a port where a contagious disease prevails, being liable to communicate the disease, may be excluded, and in extreme cases it may be thrown into the sea. *This comes in direct conflict with the regulation of commerce, and yet no one doubts the local power.* It is a power essential to self preservation, and exists necessarily in every organized community." Mr. Justice Catron, in the same case, says: "That the law of New Hampshire was a regulation of commerce among the States, in regard to the article for the selling of which the defendants were indicted and convicted, but that the State law was constitutionally passed because of the power of a State thus to regulate, *there being no regulation of Congress, special or general, in existence, to which the State law was repugnant.*"

This was declared to be the rule by the entire Court, and sustained by the opinion of six of the Judges. The question was necessarily involved in those cases and determined by the Court. This is certainly an array of authorities which no Court should disregard except upon the most pressing necessity, and upon counter authority equally binding.

It is claimed, however, that the Supreme Court in the cases of *Gibbons* v. *Ogden*, 9 Wheat. 1; *Brown* v. *The State of Maryland*, 12 Wheat. 392, and the Passenger Cases, 7 Howard, 392, settle the question in favor of the exclusiveness of the power. We think not. The case of *Gibbons* v. *Ogden* did not involve the question. That case arose upon an Act of the Legislature of New York granting to certain persons the exclusive privilege of navigating all the waters within the jurisdiction of the State with steamboats. The complainant claiming the exclusive right under this Act, sought to obtain an injunction to restrain the respondent from navigating the waters within the jurisdiction of the State. The Supreme Court held the Act of New York unconstitutional, simply upon the ground that it was in conflict with the Act of Congress providing for enrolling and licensing vessels in the coasting trade. The respondent's vessel having been licensed under the Act, was entitled, say the Court, to navigate any of the navigable waters of the United States, and no State had a

right to forbid it, as was done in that case. And the Court expressly waive the question of exclusiveness. On page 200, the Chief Justice says: "In discussing the question whether this power is still in the States in the case under consideration, we may dismiss from it the inquiry whether it is surrendered by the mere grant to Congress, or is retained until Congress shall exercise the power. We dismiss that inquiry because it has been exercised, and the regulations which Congress deemed it proper to make are now in full operation." The great Judge who delivered the opinion in that case, has, we think, repudiated the notion that any such point was determined by the Court. The case of *Wilson* v. *The Blackbird Creek Marsh Company* came before the same tribunal subsequently to the decision of *Gibbons* v. *Ogden*, and that case was relied on by the counsel for the plaintiff in error as conclusive to establish the unconstitutionality of the law of Delaware, but the Court holds distinctly and emphatically that the mere grant of power to Congress is exclusive only so far as it may be exercised by it—thus utterly ignoring the construction which has been so often placed upon the case of *Gibbons* v. *Ogden*. The only question decided in the case of *Brown* v. *The State of Maryland* was, that a State law prohibiting an importer of foreign goods from selling without a license was unconstitutional, because repugnant to that article of the Constitution which declares that "No State shall lay any impost or duties on imports or exports," the Court holding that the importation gave a right to the importer to sell such goods free from any charge by the State. It is also said by the Court that Congress having authorized the importation, by implication authorized the sale by the importer, and therefore any law by the State prohibiting such sale, or taxing the privilege, was an interference with the regulation of commerce by the General Government.

Nothing further was determined in that case, and it certainly bears no analogy to the one under consideration.

The opinions and reasonings of some of the Judges in the Passenger Cases are unmistakably in conflict with our position, and to many of the former decisions of the same Court.

But those opinions, so far as they pass upon the question of

the exclusiveness of the power of Congress to regulate com-
merce, did not receive the concurrence of a majority of the
Justices. Chief Justice Taney and Judges Daniels, Nelson
and Woodbury dissent from the opinions delivered by the
other Judges, and Mr. Justice Catron distinctly says that the
question did not arise in those cases, and placed his concur-
rence upon the ground that the Acts of New York and Mas-
sachusetts were repugnant to certain laws of Congress. If he
had not changed the opinion which he entertained in the
License Cases (and there seems to be no indication that he had)
a majority of Justices were opposed to the reasoning of Judge
McLean. Nothing was, therefore, determined in that case,
but that the laws of New York and Massachusetts were in
conflict with certain laws of Congress regulating commerce
and treaties of the General Government, and that they were
for those reasons void. If it were admitted, however, that
the Passenger Cases determined the question in favor of the
exclusiveness of the power, and the reasoning of Judge
McLean is to prevail, those cases are, utterly irreconcilable
with the theory upon which a large number of cases have
been decided by that Court, and which are still accepted as
authority. And it must be admitted that the reasoning of
Judge McLean does not sustain the position, and is in direct
conflict with his opinions in other cases. In the case of *Thur-
low* v. *The Commonwealth of Massachusetts*, he says: "A
license may be required to sell foreign articles when those of a
domestic manufacture are sold without one. And if the
foreign articles be injurious to the health or morals of the
community, a State may, in the exercise of that great con-
servative police power which lies at the foundation of its pros-
perity, prohibit the sale of it." But how, if the power to
regulate commerce, be exclusive in Congress, can a State pro-
hibit the importation of any article of commerce? There is
surely nothing in the Constitution which authorizes the pro-
hibition or control of one article more than another. Is there
anything in the grant of power which authorizes the prohibi-
tion of an article which is injurious to the health or morals of
the community any more than that which may be prejudicial
to its manufacturing or agricultural interests? Certainly not.

The word "commerce," as used in the Constitution, includes commerce in all its ramifications, and in every feature or form which it may assume—that is, with foreign countries and among the States—and if the power to regulate it be exclusive, it is co-extensive with the meaning of the word. If Congress alone can exercise that power, the conclusion is easily shown by the simple syllogism. A State law regulating commerce is unconstitutional and void. A law prohibiting the importation of licentious publications, infected goods, or providing quarantine regulations, is a regulation of commerce. Therefore, any law affecting those subjects is unconstitutional. And yet it is admitted by all that a State may prohibit the importation of such articles, and may make quarantine regulations.

And it seems impossible to maintain it upon any hypothesis, except that the power to regulate commerce is concurrent in Congress and the several States. It would be the propagation of a dangerous heresy to hold that a State may regulate commerce whenever, in the discretion of its Legislature, the health or morals of the community require it, and that such regulation would be superior to the power of the General Government. This would be making the power of Congress to regulate commerce subordinate to the police power of the State; for it gives to the State the power of determining what articles may be imported and what prohibited, and it needs no argument to show that the power which may prescribe what articles may be the subject of commerce is the controlling one. If the State has a right to determine what articles of commerce are or are not injurious to the health or morals of the community, and to prohibit the importation of whatever may be deemed so injurious, it must be admitted that its power over Congress is unlimited and supreme, and if the power is exclusive in Congress it amounts to a prohibition upon the States, and no necessity, such as the preservation of health, morals or safety of the community, could sustain the State law which in any wise regulated commerce, and the exceptions which are made are unwarrantable.

The better rule, and that sustained by the preponderance of authority, seems to be, that subject and subordinate to the

power of Congress a State may regulate commerce within its own jurisdiction, and its laws enacted for that purpose are unconstitutional only when they conflict with, or are repugnant to some act or regulation of the General Government. This rule removes all possible difficulties, recognizes the supremacy of the power of Congress, and its exclusiveness so far as it may be exercised, and enables the States to relieve themselves from the evils and inconveniences which might possibly arise from the failure or neglect of Congress to exercise any power granted to it. In other words, the States are enabled to protect themselves, not from the laws or constitutional authority of Congress, but from its inaction.

Upon the second point made by counsel for petitioner, little need be said. We do not think that the passengers upon whom this tax is levied can be included within the provision of the Constitution, which declares that no State shall lay any duties or imposts on imports or exports.

It seems to be generally admitted that the words import and export have reference only to property and not to persons. (*Brown* v. *State of Maryland.*)

Neither does the tax conflict with Section 7 of Article II. of the State Constitution, which limits the poll tax to four dollars upon all male residents of the State within certain ages. This cannot be considered a poll tax within the meaning of that section of the Constitution. If it be a tax upon the passenger at all, it is levied upon those enjoying or exercising a certain privilege. But it is more properly a tax upon the common carrier regulated by the number of passengers transported. The State law is therefore constitutional.

The time having expired during which the petitioner could be held under the commitment of the Court below, no order can be made remanding him to the custody of the Sheriff, but our views here expressed may be a guide in subsequent cases of this character.