WESTERN UNION TELEGRAPH COMPANY, Appellant, *v.* ATLANTIC AND PACIFIC STATES TELEGRAPH COMPANY, Respondent.

Ex Parte Crandall, (1 Nev. 294) as to the point that the authority of Congress to regulate commerce between the States is not exclusive but paramount when exercised, approved.

Telegraphic Communication—"Commerce." Telegraphic communication between the States is a part of their commercial intercourse, and its regulation as commerce is within the constitutional jurisdiction of Congress.

Power of Congress as to Telegraph Lines. The Act of Congress of 1866, in aid of telegraph lines, etc., (14 U. S. Stats. at Large, 221) in so far as it prescribes privileges, conditions, etc., is an Act regulating commerce and supercedes State legislation.

Western Union Telegraph Co. *v.* Atlantic and Pacific States Telegraph Co.

STATE TELEGRAPH FRANCHISES. The congressional grant to all persons under certain conditions of the privilege of constructing telegraph lines, (14 U. S. Stats. at Large, 221) overrules any exclusive privilege given by any State or Territory to one.

PROOF OF ACCEPTANCE UNDER CONGRESSIONAL TELEGRAPH ACT. Where a telegraph company claims privileges under the Act of Congress of 1866, (14 U. S. Stats. at Large, 221) it is incumbent on it to show an acceptance by it of the terms prescribed in the Act, and the most proper mode of doing so is by a certified copy of the acceptance filed under the seal of the department.

EVIDENCE—LETTER OF U. S. POSTMASTER-GENERAL. Though a letter of the U. S. Postmaster-General, to the effect that the acceptance by a telegraph company of the terms and conditions of the Act of Congress relating to telegraph line, (14 U. S. Stats. at Large, 221) had been received and placed on file, might be proof of such acceptance, it cannot be so without authentication of the signature.

APPEAL from the District Court of the First Judicial District, Storey County.

On February 9th, 1864, the Legislature of Nevada Territory granted to John B. Watson and his assigns the right to construct and maintain a telegraph line from Unionville by way of Star City, Austin, Virginia City, Gold Hill, and Carson City, to the State of California, by a route north of Lake Bigler, (Stats. 1864, 97). Watson assigned to H. W. Carpentier, who assigned to the California State Telegraph Company. After the construction of the line by that company the Governor of Nevada certified its completion, and the franchise thereby became, as provided by the Act, an exclusive one for five years. In May, 1867, the California State Telegraph Company leased the line to the plaintiff for one year, and until the termination of the lease by either party on six months' notice.

In 1868, the respondent proceeded to construct a telegraph line along the U. S. Mail routes connecting Virginia City, Gold Hill, and Reno, with California. This suit was commenced on February 13th, 1869, for the purpose of obtaining an injunction pending the suit restraining the respondent from proceeding with its construction or doing telegraphic business between any of the places mentioned in its franchise; for a perpetual injunction to the same effect on final decree, and for six hundred dollars damages.

*Williams & Bixler*, for Appellant.

I. Is telegraphing commerce, and the regulation thereof, a regulation of commerce? We claim not. (*Ex parte Crandall*, 1 Nev. 294; *Crandall v. State of Nevada*, 6 Wallace, 35; 1 Black. 631; 1 Kent, 366; 3 How. 162; 14 How. 574; 18 How. 430; 20 How. 93; 3 Wallace, 51.)

Congress has not attempted to regulate telegraphy, and until it shall do so, the States have control of the subject. The Act of Congress, under which defendant claims to act, only gives the right of way over public lands and along post-routes, but does not attempt to *regulate* the business.

II. Plaintiff's franchise is private property, and cannot be taken for public use except upon first making just compensation. (See cases cited under last point, and 4 Howard, 517; 10 Barb. 233; 2 Gray, 1; 6 Howard, 529.)

*George Cadwalader*, for Respondent.

I. Is the Act an attempt to regulate the business of telegraphing between two States? The manner of regulating this species of traffic is of no concern to us, provided there existed the power of regulation. The manner of the regulation here, was by obliging to go in one channel by closing up all others. Commerce is the synonym of "intercourse"—*Gibson v. Ogden*, (9 Wheaton, 174)—the definition of which is broad enough to include "telegraphing": a new kind of business originating since the Constitution. The line of defendant is but a conduit of commerce between California and Nevada. If traffic over it is unlawful, it is because the Territory of Nevada has so regulated it by declaring that all such traffic shall be carried on by lines erected by Watson or his assigns; and this, we conceive, is exactly what the Constitution intended that States should be without the power to do. (*Carson River Lumbering Co. v. Robert Patterson*, 33 Cal. 334.)

II. The case shows that the defendant has accepted the provisions of the Act of Congress, and become a public vehicle of intercourse, as far as that Act can make it. This Act makes our presence in Nevada lawful—the Territorial Act makes it unlawful.

The General Government invites us to build, and bargains for the use of our line, on its own terms, for postal, military, and other purposes : while the other, stamps the intercourse as an unlawful infringement upon the rights of Watson or his assigns. Both regulations cannot stand ; and the question is, which shall ? Can it be doubted which is the dominant authority ? (See *People* v. *Raymond*, 34 Cal. 495.)

III. Defendant was created a corporation for the purpose of connecting, by telegraph, San Francisco with Chicago and the intermediate points. Should power exist in the Territory of Nevada to stop it from passing over its territory during the lifetime of the Act of 1864, the same power would exist in Utah and Colorado, and the States of Nebraska, Iowa, and Illinois ; and hence, a refractory State or Territory would have the right to prohibit intercourse between citizens of the United States at its pleasure.

The Government of the United States would exist more in name than in fact, if each State or Territory had the power, at their discretion, to regulate commercial intercourse between the States. What is " rightful legislation " on the part of a Nevada Assembly is uncertain ; but it surely does not extend to granting such franchise as the one which threatens our existence in the State of Nevada. Does a stream rise higher than its source ? Can the military and postal service, which we have bargained to give the Government depend upon the sanction of Nevada ?

*C. J. Hillyer*, also for Respondent.

A careful examination of the opinion of this Court in *Ex parte Crandall*, which seems to me to have been substantially approved by the Supreme Court of the United States, shows that there is nothing in that opinion to lead the Court to uphold the constitutionality of the Nevada Act under the commercial clause of the Constitution. The reasons given for holding the passenger tax not to be a commercial regulation do not apply to a law prohibiting free intercourse by telegraph between the important business places of two States ; and whether the power to regulate be exclusive is immaterial, as in this case. Congress has legislated, and we are acting under that legislation. The general principles, however,

8

announced by the Supreme Court in the *Crandall Case*, with regard to the respective powers of the National and State governments, seem to us conclusive of this case, independent of all questions respecting the regulation of commerce.

By the Court, WHITMAN, J.:

The appellant seeks an injunction against respondent, to restrain it from prosecuting the business of telegraphy in the State of Nevada, claiming to be the present proprietor of the exclusive right thereto, as lessee of the assignee of one Watson, franchisee under an Act of the Legislature of the Territory of Nevada.

This appeal is from an order of the District Court refusing a temporary injunction. Several objections are made to the present validity of the franchise, all of which, with the exception of these immediately hereafter noted, are fully obviated by the certificate of the Governor, made conclusive by the terms of the Act referred to. It is claimed that the lessor of appellant, the California State Telegraph Company, did not succeed to the rights of Watson; the proof on the point shows that it did. Finally, it is objected that as the Act in question is an attempt to regulate commerce between States, it is an invasion of the exclusive powers of Congress over such matters. Admitting for the present, that such was the intention and effect of the statute, and without any minute recital of authorities, or extended argument, suffice it to say, that upon careful review of the cases touching the question, the conclusion reached in *Ex parte Crandall*, (1 Nev. 294) is still maintained, and that not only the weight of authority but principle sustains the opinion, that the authority of Congress as to such regulation is not exclusive, but that a State may properly enact laws regulating commerce between itself and other States, in the absence of Congressional legislation, subject always to the paramount authority of that body when exercised upon the matter.

The last published case decided by the Supreme Court of the United States, where the point was involved, makes the distinction that in some cases of the regulation of commerce the power of Congress is exclusive; in others, not. That seems to be an admission of the proposition that in the strict use of terms it is not an

exclusive power.   (*Crandall* v. *State of Nevada,* 6 Wallace, 35.)
This investigation in the present case becomes material only in view
of the plaintiff's right to bring any action, as Congress has passed
an Act (14 U. S. Stats. at Large, 221) which, if held to be a
regulation of commerce, brings the parties within an undisputed
rule.   Whatever doubts may have existed as to the power of the
several States to regulate commerce between their own citizens and
the citizens of other States, in the absence of legislation on that
subject by the Congress of the United States, it has never been
seriously questioned, that when Congress in the exercise of its
constitututional right, does legislate on that particular subject, its
authority is paramount, and its enactments supersede all State
legislation thereon.   Conceding, then, plaintiff's right of action, un-
less defeated by the Act of Congress cited, it becomes material to
inquire whether such Act is a regulation of commerce.   The Act is
as follows :

" AN ACT TO AID IN THE CONSTRUCTION OF TELEGRAPH LINES, AND TO SECURE TO
    THE GOVERNMENT THE USE OF THE SAME FOR POSTAL, MILITARY, AND OTHER
    PURPOSES.

" *Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,* That any
telegraph company now organized, or which may hereafter be
organized, under the laws of any State in this Union, shall have
the right to construct, maintain, and operate lines of telegraph
through and over any portion of the public domain of the United
States, over and along any of the military or post roads of the
United States, which have been, or may hereafter be declared such
by Act of Congress, and over, under, or across the navigable
streams or waters of the United States : *provided,* that such lines
of telegraph shall be so constructed and maintained as not to
obstruct the navigation of such streams and waters, or interfere
with the ordinary travel on such military or post roads, and any
of such companies shall have the right to take and use from
such public lands the necessary stone, timber, and other materials,
for its posts, piers, stations, and other needful uses in the con-
struction, maintenance, and operation of said lines of telegraph,

and may preëmpt and use such portion of the unoccupied public lands subject to preëmption through which its said lines of telegraph may be located as may be necessary for its stations, not exceeding forty acres for each station, but such stations shall not be within fifteen miles of each other.

" Sec. 2.   *And be it further enacted,* That telegraphic communications between the several departments of the Government of the United States and their officers and agents shall, in their transmission over the lines of any of said companies, have priority over all other business, and shall be sent at rates to be annually fixed by the Postmaster-General.

" Sec. 3.   *And be it further enacted,* That the rights and privileges hereby granted shall not be transferred by any company acting under this Act to any other corporation, association, or person : *provided, however,* that the United States may at any time after the expiration of five years from the date of the passage of this Act, for postal, military, or other purposes, purchase all the telegraph lines, property, and effects, of any or all of said companies, at an appraised value, to be ascertained by five competent, disinterested persons, two of whom shall be selected by the Postmaster-General of the United States, two by the company interested, and one by the four so previously selected.

" Sec. 4.   *And be it further enacted,* That before any telegraph company shall exercise any of the powers or privileges conferred by this Act, such company shall file their written acceptance with the Postmaster-General, of the restrictions and obligations required by this Act."

Congress has power " to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."   (U. S. Const., Art. I, Sec. 8.)

What is commerce ?   " Commerce is intercourse," say writers and judges.   There is no need to attempt here any definition of the word " intercourse," nor to consider whether it was used with or without limitation : and if with limitation, what; for the Supreme. Court of the United States, by one of its ablest members, has given a plain and comprehensive exposition of the term " commerce," less general than the mere word " intercourse " used, without qualifica-

tion, but sufficient to include all the ramifications of commerce. Says Marshall, C. J.: "It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." (*Gibbons* v. *Ogden*, 9 Wheaton, 1.) Is telegraphy any branch of commercial intercourse? To ask the question is to answer it. So interwoven has the custom of communication by telegraph become with trade and traffic, that to separate it without serious disturbance of vast trade relations and financial transactions, would be a task as difficult as to cut the pound of flesh without a single drop of blood. It is the life and soul of civilized commercial transactions; many of the most important are daily ruled by telegraph. The banker, the merchant, the farmer, the broker, all traders depend upon the telegraph for speedy information and means of intercourse in their various business and traffic. If the ship that carries the cargo comes within the constitutional power of Congress to regulate commerce, as it confessedly does, as a means of commercial intercourse, certainly the instrumentality through which is directed the lading, sailing, and unlading of the ship, the purchase and sale of the cargo, and all the minutiæ of the venture and the voyage, is equally a means, only of a higher and more advanced grade.

Commerce, though it would be seriously crippled, could exist without telegraphy, as it might without many of its favoring incidents; but it is one of the adaptations of modern science, so simple in its grandeur as to be already accepted almost without wonder, but which the slightest reflection teaches is of such vast utility that it can hardly be too highly prized, nor can any unlawful infringement upon its free use and enjoyment be too carefully guarded against.

Does the Act of Congress attempt to regulate this branch of commercial intercourse? On the part of appellant it is claimed not, because no specific rules are prescribed for its exercise. The Act gives to any telegraph company the right to construct, maintain, and operate telegraph lines on the public lands of the United States, and along the post and military roads, upon evidence of acceptance of its terms under specified restrictions, and for certain compensation, which is the priority of Government messages, and

the privilege of purchase, at option, by the United States, at any time after the expiration of five years. To that extent, then, there is regulation; the right is given by rule, and limited by rule, certainly as much regulated as the licensing or registering of vessels. By obtaining a license under certain terms, an owner may navigate his vessel between specified State ports, and traverse designated waters. A register gives other and greater privileges, under other and peculiar restrictions; both are regulations of commerce. In the particular matter in question, the Congress could undoubtedly exercise greater power, and still further regulate, but any regulation is sufficient to supercede State legislation, and the right granted to all overrules any exclusive privilege given by any State or Territory to one. Has the defendant brought itself within the Act? As a matter of fact it may have done so—probably has, but it failed to make the requisite proof in the District Court.

It is possible that the letter from the Postmaster-General would have been sufficient, had his signature been authenticated; but the regular and proper mode would require a certified copy of the acceptance, filed under the seal of the department. This, not that the Court might judge of the sufficiency of the acceptance, but that it might be satisfied that the United States Government, through the agent appointed, held in the records of the postal department, what it considered an acceptance under the Act of Congress, and that consequently the party filing the same had complied therewith, and was qualified to act thereunder. Without this proof, defendant stood in Court a trespasser upon the exclusive franchise of appellant, as only by virtue of lawful proceeding could any right be acquired against it. Right upon the other points considered, the District Court erred in this, and unless the case was held open for further evidence, should have granted the temporary injunction, " or injunction pending the suit."

Its order is reversed, and the cause remanded.