GEORGE L. GIBSON, Respondent, *v.* H. S. MASON, Treasurer of Ormsby County, Appellant.

Popular Government. The maxim that all political power originates with the people lies at the foundation of our political system; but after the organization of government it is only through their representatives that the people can exercise it.

Federal and State Powers. The Federal Government was organized by the concession to it of such certain specified powers as were deemed necessary to secure and promote the general welfare of all the States, the residuum being

Gibson *v.* Mason.

retained by the people; and these reserved powers are supreme and absolute over life, liberty, and property, except as restrained or limited by their own concessions through the Federal Constitution.

RESERVED SOVEREIGN POWERS OF THE STATES. The powers reserved by the people from the Federal Government have never been, nor are they in any instance exercised by the people at large, but by the governments of the States, which are clothed with all the sovereign authority so reserved.

CO-ORDINATE BRANCHES OF STATE GOVERNMENT. Each department of the State government—legislative, executive, and judicial—is supreme within its respective sphere.

LEGISLATIVE POWER OF STATE LEGISLATURE. The State Legislature possesses legislative power unlimited except by the Federal Constitution, and such restrictions as are expressly placed upon it by the State Constitution; it is within the sphere of legislation the exponent of the popular will, endowed with all the power in this respect which the people themselves possessed at the time of the adoption of the Constitution.

THE LEGISLATURE THE JUDGE OF EXPEDIENCY. The power to make the law must necessarily carry with it the right to judge of its expediency and justice.

ORMSBY COUNTY RAILROAD BONDS. The Act authorizing the issuance of the bonds of Ormsby County to the Virginia and Truckee Railroad Company (Stats. 1869, 43) is not unconstitutional.

LEGISLATIVE POWER AS TO AIDING RAILROADS. Section ten of article eight of the Constitution, which prohibits counties, cities, and towns from becoming stockholders in corporations, or loaning their credit in aid of any corporations, except railroad companies, though it does not *confer* any right upon such organizations, does not prevent the Legislature from authorizing a county to aid a railroad, either by loaning its credit, donation, or otherwise.

MEANING OF "LOANING CREDIT." To allow a county to loan its credit to a railroad company (Const., Art. VIII, Sec. 10) is virtually allowing a donation, because the right to loan its credit must involve the right to pay any liabilities which may be incurred by that means.

MEANING OF "DUE PROCESS OF LAW." By "due process of law," as used in section eight of article one of the Constitution, is meant such general legal forms and course of proceedings as were known either to the common law, or as were generally recognized in this country at the time of the adoption of the Constitution.

COLLECTION OF TAXES BY SUMMARY PROCESS. The power of taxation carries with it the right and power of collecting taxes by summary process.

LOCAL OR SPECIAL LAW OF TAXATION. Section twenty of article four of the Constitution, so far as it forbids local or special laws "for the assessment and collection of taxes," was intended simply to inhibit local or special laws respecting or regulating the manner or mode of assessing and collecting taxes, and does not prevent the Legislature from authorizing or directing County Commissioners from levying a special tax by the passage of a local law.

MEANING OF "FOR ASSESSMENT AND COLLECTION OF TAXES." The word "for" in section twenty of article four of the Constitution, which inhibits local or special

laws "for the assessment and collection of taxes," means "with respect to," or "with regard to."

LEGISLATIVE POWER OF TAXATION UNLIMITED. So far as the extent of taxation is concerned, or the purposes for which taxes may be levied, provided such purposes are public in their nature, there is no limit or restriction placed upon the legislative power.

RAILROADS PUBLIC IMPROVEMENTS. A railroad is a public improvement and a proper object for public aid; and the mere fact that private individuals are to own it and receive the tolls in no wise impairs or diminishes the advantages to be derived from it to the public.

RAILROAD USES PUBLIC USES. It is only on the ground that railroads are public improvements that private property can be condemned for their uses; for in no case can private property be taken, even where just compensation is paid, except for public uses.

COUNTY BONDS FOR RAILROAD AID. As money may be raised by taxation for aiding railroads, bonds may be issued for the same purpose to be paid by means of taxation.

TAXATION FOR INTEREST OF UNISSUED COUNTY BONDS. Under the Act authorizing the issuance of the bonds of Ormsby County in aid of the Virginia and Truckee Railroad Company, (Stats. 1869, 43) the County Commissioners of that County, before the issue of the bonds, levied a tax for the purpose of meeting interest: *Held*, that the levy was not premature, any more than a levy would be for any other anticipated liability.

STATUTORY CONSTRUCTION—OBJECT AND MEANS. As it is a rule of construction that when anything is required to be done the usual means may be adopted for performing it, the Courts, in the interpretation of statutes, so construe them as to carry out the manifest purpose of the Legislature; and this has been done in opposition sometimes to the very words of an Act.

APPEAL from the District Court of the Second Judicial District, Ormsby County.

The defendants in this action were H. F. Rice, S. E. Jones, and A. B. Driesbach, as and composing the Board of County Commissioners, and H. S. Mason, County Treasurer and *ex officio* Tax Collector of Ormsby County. The Treasurer and County Commissioners took separate appeals from the orders allowing and refusing to dissolve the injunctions against them respectively. The following opinion was written on the appeal of the Treasurer, but, as will be seen, it covers the appeal of the Commissioners also.

*Hillyer, Wood & Deal,* for Appellants.

I. The Legislature had power to authorize and direct the county

bonds to be issued to the Railroad Company. (*Gelpecke* v. *City of Dubuque*, 1 Mallatt, 175; 30 Cal. 435; 27 Cal. 175; 22 Cal. 379; 23 Cal. 323; 26 Cal. 642; 15 Coms. 475; 18 N. Y. 38; Sedgwick on Const. and Stat. Law, 180–188.)

There is no prohibition in the Constitution. Section ten of article eight prohibits nothing as to railroad companies. If a donation is included in the expressions "become a stockholder," or "loan its credit," then railroad companies are expressly excepted from the operations of the section. If donation is a distinct thing and not included in those expressions, then a county is not prohibited from making a donation, even to other corporations and associations than railroad companies. Upon no construction is anything forbidden in respect to railroad companies.

The power cannot be denied by implication, nor otherwise than by a positive prohibition, clear beyond doubt. (26 Cal. 161; 24 Wendell, 215; 24 Barb. 248; 17 N.Y. 235; Sedgwick on Const. and Stat. Law, 483.)

II. The tax was not prematurely levied. The levy was in literal compliance with the wording of the Act, for it was levied annually at the same time as other taxes. It was in compliance with the spirit of the statute—for the purpose of the Act was to meet the interest when due, and this could only be done by a levy made in this year.

The State had full power over the subject and authority to direct the tax to be collected before the bonds might be issued. The Commissioners, not being restricted by special statutory directions, had a right to use their discretion—to take cognizance of facts and probabilities as in regard to most other taxes, and make the levy in time to save the credit of the county, and fulfill the provisions which they were morally certain they would be compelled by law to make. (22 Ind. 204; 23 Geo. 566; 32 Eng. Law and Eq. 249; 19 Mo. 187; 13 Cal. 343; 14 Cal. 148; 11 Penn. State 61; 10 Mass. 115.)

*Clayton & Davies*, for Respondent.

I. The Act in question is in conflict with section ten, article eight, of the Constitution. That section, in the old Constitution of

1863, prohibited counties from subscribing to the stock of, or lending credit to, any corporation whatever; and it was the manifest intention of the constitutional convention of 1864 to amend it only to the extent of allowing counties, cities, etc., to subscribe for stock of railroad companies, or to lend their credit in aid of such companies: no farther power was to be allowed. The right to donate was not contemplated. The design was to prevent injudicious investments of the general property of the people of a county or city in joint stock companies, and to allow such investments to be made in the stock of railroad corporations only where an equivalent in the shape of mortgage bonds or capital stock was received in return.

II. The Act conflicts with section nine, article eight, of the Constitution, which provides that "The State shall not donate or loan money, or its credit, subscribe to, or be interested in, the stock of any company, association, or corporation, except corporations formed for educational or charitable purposes." Now, while the State is allowed to donate for certain purposes, no provision is made for counties to do so; and as this kind of a transaction, *nudum pactum* as it is, is universally discouraged at law, no such right can be exercised, unless the same is expressly granted. Again, if the Legislature can compel the county of Ormsby to donate to a railroad corporation, it can in the same way compel every other county in the State to do the same thing, and thus practically donate the money and credit of the State in defiance of the Constitution.

III. The Act is repugnant to section eight, article one, of the Constitution of this State, and to article five of the amendments to the Constitution of the United States, which provide that "No person shall be deprived of his property without due process of law."

Statutes which would deprive a citizen of the rights of person or property without a regular trial, according to the course and usage of the common law, would not be the "due process of law" in the sense of the Constitution. (*Hoke* v. *Henderson*, 4 Devereux, N. C. 12; 2 Coke, Litt. 50; 3 Story on Const., 264 and 661; 1 Kent's Com. 612, 613, and note *c*; 2 Yerger, 500; 10 Yerger, 71; 4 Hill, 145; 18 Wendell, 59; 19 Wendell, 675; 5 Paige,

159; 5 Barbour, 481; 3 Comstock, 516.)    The Act is also repug-
nant to the provisions which forbid the taking of private property
for public use without just compensation.   While private property
may be taken, upon just compensation, for public use, it cannot be
taken, against the consent of the owner, for private use, even when
just compensation is made or offered; and much less can it be taken
for private use without just compensation.   (18 Wendell, 59; 19
Wendell, 675; 4 Hill, 145.)

IV. The Act is in violation of section twenty, article four, of the
Constitution, which forbids local or special legislation in regard to
the assessment and collection of taxes for State, county, or town-
ship purposes.   If this tax is not for any of these purposes, the
Legislature had no right to impose it; if it is for any of these pur-
poses, special legislation concerning the same is expressly forbidden.

V. The Act, the effect of which is to divest the property of one,
and transfer the same to another, is an attempt on the part of the
legislative department to exercise functions appertaining to the
judiciary, which can only be done by sentence of a competent
Court.   (4 Devereux, N. C. 12; 3 Scammon, 238.)   And in so
far as it thus attempts to take property without giving anything in
satisfaction, the act is repugnant to natural justice.   ( *Wilkinson* v.
*Leland*, 2 Peters, 657; 9 B. Monroe, 345; 4 Ohio, 291.)

VI. All political power is lodged originally in the people, and all
power not granted in the Constitution to one of the three coördi-
nate branches of the State Government, still remains in the people
to be exercised as they see fit.   Has the Legislature the power to
compel a county to lend its credit to or subscribe for the stock of a
railroad corporation?   The better course would seem to be, and one
more in keeping with the fundamental maxims of a free government,
to submit such propositions to the voters of the county.   If the
Act is constitutional and just, then with equal propriety might the
Legislature at its next session require the people of Ormsby County
to donate to any person it might choose, one hundred thousand dol-
lars, upon his building a substantial edifice for his private residence
in Carson City.

Under our form of government, the Legislature is not supreme.
It is only one of the organs of that absolute sovereignty which

resides in the whole body of the people ; like other departments of government, it can only exercise such powers as have been delegated to it ; and when it steps beyond that boundary its acts, like those of the most humble magistrate of the State, who transcends his jurisdiction, are utterly void.  (*Billings* v. *Hall*, 7 Cal. 10 ; *Nougues* v. *Douglass*, 7 Cal. 70 ; *Hanson* v. *Vernon*, 3 Western Jurist, 134 ;  *Whiting* v. *Sheboygan R. R. Co.*, 1 Chicago Leg. J. 378 ;  *Curtis* v. *Whipple*, Leg. J. 335.)

By the Court, LEWIS, C. J.:

This appeal is taken from an order granting an injunction against the defendant, whereby he is restrained from collecting a certain tax levied by the Commissioners of Ormsby County in pursuance of authority conferred by an Act of the Legislature, approved January 27th, A.D. 1869.

It is attempted here to sustain the action of the Court below upon the grounds: 1st, that the Act authorizing the tax in question is unconstitutional and void ; and 2d, that under the terms of the law itself, the tax is.prematurely levied.   The Act directing the levy of this tax also authorizes the Commissioners to issue to the Virginia and Truckee Railroad Company the bonds of the county to the extent of two hundred thousand dollars, the tax in question being levied to meet the interest to accrue on them.    An injunction was also issued by the same Court at the same time enjoining the issuance of these bonds, from which an appeal is likewise taken by the Commissioners.    As the unconstitutionality of the Act is the only ground upon which it is attempted to justify the second order, it will only be necessary to consider the first appeal, as that embraces the sole question involved in the second.   A clear understanding of the nature of the law and the character of the tax, the collection of which is enjoined, may be obtained from these sections which embody its principal features :

Section 1.·  " Whenever, within eighteen months from .the passage of this Act, the Virginia and Truckee Railroad Company, a corporation existing under the laws of this State, shall have completed the construction of a first class iron railroad from some point within the limits of the City of Carson to a point upon .the county

line of Ormsby County, on the line of a railroad between said city and the City of Virginia, Storey County, and the same shall be in complete readiness to receive the rolling stock proper therefor, the Board of County Commissioners of Ormsby County are hereby authorized and directed to prepare and issue the bonds of said county to the amount of two hundred thousand dollars, in the form hereinafter specified, and deliver the same to the Virginia and Truckee Railroad Company, for its benefit.

Sec. 3. "Immediately after being notified by the Company of the fulfillment of the conditions upon which said bonds are to issue as above stated, the Board of Commissioners shall proceed to satisfy themselves, by personal inspection or otherwise, of the fact of the performance of said conditions, and on being so satisfied shall without delay prepare, issue and deliver the bonds as above directed: *provided*, that the certificate of the Surveyor-General of the State and the County Surveyor of Ormsby County to the fact of fulfillment of said conditions shall be conclusive evidence thereof to said Commissioners.

Sec. 4. "The said Board of County Commissioners are hereby authorized and required to levy and collect annually, until all of said bonds issued under the provisions of this Act shall have been fully paid or provided for, a tax of one per cent. upon all taxable property of Ormsby County, to be applied exclusively to the payment of the principal and interest of said bonds, to be issued as herein provided: *provided*, that for the first two years after the issuance of said bonds, the surplus of the proceeds of said tax, if any there be, after the payment of said interest, shall be paid into the General Fund of said county, and after said two years said surplus shall be used in the Redemption Fund as hereinafter provided.

Sec. 5. "The said Board of County Commissioners are further authorized and required to levy and collect annually, during the five years succeeding the two years above mentioned, such tax upon all the taxable property in Ormsby County, in addition to the aforesaid tax of one per cent., as shall be sufficient to raise the sum of five thousand dollars per annum, to be applied exclusively to the redemption of the said bonds to be issued as herein provided. And after said five years the said Commissioners shall levy and collect annu-

ally, in addition to said tax of one per cent., such further tax, if any shall be necessary, as will be sufficient to pay the accruing interest, and to redeem annually one-eighth of the amount of bonds outstanding at the end of seven years from the date of this issuance.

Sec. 6. "The amount raised by the tax levied as above required, and not hereinbefore directed to be placed in the General Fund, shall be placed in a separate fund, to be called the ' Railroad Interest and Sinking Fund,' which shall be applied: First, to the payment of the semi-annual interest, as above directed ; and second, to the redemption of said bonds, as provided in the following sections."

This law is claimed to be repugnant to natural right and justice ; and it is argued, as there is no specific power granted to the Legislature authorizing the passage of such a law, it must be held unauthorized and void.   To answer this branch of the argument for respondent, it becomes necessary to ascertain the limits of the legislative power of the State, and the extent of the judicial power to annul or circumscribe legislative action.

The maxim, which lies at the foundation of our government, is that all political power originates with the people.   But since the organization of government, it cannot be claimed that either the legislative, executive, or judicial powers, either wholly or in part, can be exercised by them.   By the institution of government the people surrender the exercise of all these sovereign functions of government to agents chosen by themselves, who at least theoretically represent the supreme will of their constituents.   Thus, all power possessed by the people themselves is given and centered in their chosen representatives.   The Federal Government was organized by the concession of such specified powers to it as were deemed necessary to secure and promote the general welfare of all the States ; but the governmental powers so conferred are admitted to be limited to the few objects for which that government was created, the residuum being retained by the people.   The power so reserved must be admitted to be supreme and absolute, over life, liberty, and property, except as restrained or limited by their own concessions through the Federal Constitution.   Although possessed by them, it is not now, nor has it ever been, exercised by the people at large in any portion of the Union.   But another government, that of the

State, is formed, which is usually clothed with all the sovereign authority reserved by the people from the grant of powers in the Federal Constitution. This is accomplished in this as in all the States but one, by means of the Constitution adopted by themselves, whereby all political power is conferred upon three great departments, each being endowed with and confined to the execution of powers peculiar to itself.

The legislative is vested in two bodies, the Senate and Assembly; the judicial is conferred upon certain designated Courts; and the executive upon the Governor. By the law so creating the government, certain rights are generally reserved by the people, and so placed beyond the control of, or infringement by, any of the departments of the State organizations.

The government so organized is the repository of all the power reserved by the people from the General Government, except such as may be expressly denied to it by the law of its creation, each department being supreme within its respective sphere, the Legislature possessing legislative power unlimited except by the Federal Constitution, and such restrictions as are expressly placed upon it by the fundamental law of the State—the Governor having the sole and supreme power of executing the laws, and the Courts that of interpreting them. But it has been denied by some eminent jurists as it is by counsel in this case, that the Legislature is endowed with this plenary power; and it is contended that there are other restrictions upon its authority beside the provisions of the Constitutions, Federal and State. It has not, to our knowledge, ever been held that the State Legislature is, like the Congress of the United States, confined in its legislative action to such powers as are expressly mentioned and delegated to it in the Constitution.

Such construction or holding would circumscribe its powers within such narrow limits, that probably not one State government in the Union would be able to maintain itself for any considerable length of time, with its present Constitution—for it does not seem to have been the design of the framers of any of those instruments to specifically designate all the powers desired to be conferred upon the legislative branch of the government, but rather to grant the power in general terms, and then to specify such restrictions upon

it as might be deemed desirable.  Such is the mode pursued by the framers of the Constitution of this State—thus it declares : " The legislative authority of the State shall be vested in a Senate and Assembly, which shall be designated the ' Legislature of the State of Nevada ' " ; and then follow certain sections regulating the organization and the manner in which its duties are to be performed, together with others, imposing numerous restrictions upon this power, with but few subjects mentioned upon which it is expressly authorized to legislate.  The Federal Constitution, on the other hand, specifically enumerates all the subjects respecting which the Congress of the United States shall legislate—hence, its powers are rigidly confined to such subjects.  That course is not attempted to be pursued, either in the Constitution of this State or that of any other in the Union.  The only constitutional provision conferring power of legislation is that quoted—excepting, indeed, the few cases in which laws are expressly required to be passed upon particular subjects.  That it endows the Legislature with general powers of legislation can scarcely be questioned.  But what is the extent of the authority thus granted ?  Does it embrace all the power of the people, or only a limited portion ?  Evidently the whole, except such as is expressly reserved and conferred upon the other two branches of the government.  The Legislature is then invested with all the law-making power which could possibly be granted by the people.  If not, where is it lodged ?  Certainly, not in either the judicial or executive departments ; and nothing is clearer than that it is not retained by the people themselves, for they possess no power of legislation whatever.  An Act of the Legislature made dependent upon their votes or approval would be utterly void—and so it has frequently been held.  It is quite clear, that the Legislature is within the sphere of legislation the exponent of the popular will, endowed with all the power in this respect which the people themselves possessed at the time of the adoption of the Constitution.

But, notwithstanding this very evident investment of the Legislature with the sovereign and omnipotent political power of the people, it has been assumed by some Judges, and so argued in this case, that the Courts have the right to annul an Act of the Legis-

lature upon the sole ground that it is unjust; or, as it is put in this case, opposed to natural justice; or, by some Judges, as against the " great principles of eternal right." We believe, however, that such doctrine cannot be reconciled with a correct view of our form of government and the distribution of its powers. Whence this power in the judiciary to pass upon the justice or injustice, the expediency or inexpediency, of an act of a coördinate branch of the government? It is not given in the Constitution. The Legislative power is not limited in that instrument to the enactment of just laws, or such as may, in the opinion of Judges, be deemed expedient. Nor did the people think it necessary in any way to guard themselves from laws incompatible with that uncertain thing called natural justice; or to hedge themselves about with what Judges are pleased to call the principles of eternal justice. This question is simply one of power; the Legislature either possesses it unlimited, or not at all. It cannot depend upon the extent or character of the injustice embodied in any particular law. The Courts are no more authorized to annul a law of the Legislature because opposed to the principles of natural justice, than because it may violate the simplest natural right. It cannot be supposed that the people, in delegating power to the Legislature, authorize it to violate the most indifferent natural right or justice any more than its most important or vital principles; and so, if the legislative authority be so limited, the entire civil code must stand the severe test of natural justice, or be annulled by the judiciary. If the Courts possess such power, then indeed are all the other branches of the State government entirely under the control and supervision of the judicial. Courts can as well set aside an act of the executive upon the score of injustice, as that of the Legislature. If the Constitution has not limited the powers of the Legislature to the enactment of just laws, or such as do not conflict with the principles of natural justice, the Courts have no more right to so restrict it than they have to test the validity of a law by the dogmas of the Church, or the precepts of revealed religion. If the Legislature may be held to have transcended its power in enacting a law opposed to the first principles of right, it may be held to do so at the pleasure or caprice of Judges. The power is no more given in the one case than in the other.

Gibson *v.* Mason.

Such was not the will of the people as expressed in the Consti-
tution, but rather that each of the three great departments should
be supreme within its sphere. Surely, the power to make the law
must necessarily carry with it the right to judge of its expediency
and of its justice. It is evident that a law or legislative act may
be clearly unjust in the individual case; opposed in its operations
upon some individuals to the principles of natural justice; and still
be not only an expedient law, but essential to the welfare of the
community at large. Who is to determine that a law palpably and
flagrantly unjust upon its face was not called for by an imperious
public necessity? Certainly, the Legislature and not the Courts.
They have admittedly no right to inquire into the question as to
whether it were necessary or unnecessary, expedient or inexped-
ient, to adopt a law. Nor have they any greater right to inquire
as to its justice or injustice for the purpose of annulling it. No
Judge has ever attempted to carry this assumed power of the Courts
to its legitimate and logical results, but all are daily acting in op-
position to it. Thus, it is a violation of natural justice to deprive
a man of the right to recover an honest debt after the expiration of
a limited time, but no Judge has ever attempted to hold a limitation
act void upon the ground of such injustice. It is clearly opposed
to natural justice that a man should be protected in the enjoyment
of luxury and a large amount of property, whilst those from whom
he may have obtained all are not allowed to have satisfaction of
their demands. Yet no Court will claim the right to decide an
exemption law void because thus unjust.

Such law, while it does not directly transfer the property of one
man to another, does what is equally unjust—protects him in its
enjoyment after he has obtained it. Laws of a like character are
daily coming under the observation of Judges, and as often sanc-
tioned and upheld by them. Courts have no right to declare such
law void because opposed to natural justice. The safest and best
rule, and that most in harmony with our form of government and
its distribution of power, is to maintain the supremacy of the Legis-
lature while acting in its law-making capacity, and uphold all laws
enacted by it which are not in conflict with some provision of the
Federal or State Constitutions. Nor are these views unsupported

by authority. They are justified by the decisions of the ablest Courts and the opinions of the most distinguished Judges of the land.

"The wisdom and justice of the representative body, and its relations with its constituents, furnish the only security when there is no express contract against excessive taxation, as well as against unwise legislation generally," is the language of Chief Justice Marshall in the Providence Bank case. In *Butler* v. *Palmer*, (1 Hill, 324) Mr. Justice Cowen remarked: " Strong expressions may be found in the books against legislative interference with vested rights, but it is not conceivable that after allowing the few restrictions to be found in the Federal and State Constitutions, any further bounds can be set to legislative power by written prescription."

" We cannot," says Mr. Justice Baldwin, in *Bennett* v. *Boggs*, (1 Baldwin, 74) " declare a legislative act void because it conflicts with our opinions of expediency or policy. We are not the guardians of the rights of the people of this State unless they are secured by some constitutional provision which comes within our judicial cognizance. The remedy for unwise or oppressive legislation within constitutional bounds is by an appeal to the justice and protection of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil, but Courts cannot assume their rights." Mr. Senator Verplanck, in *Cochran* v. *Van Surlay*, (20 Wend. 381) thus ably and forcibly expresses his views upon this question: " It is difficult upon any general principle to limit the omnipotence of the sovereign legislative power by judicial interposition, except so far as the express words of a written Constitution give that authority. There are indeed many *dicta*, and some great authorities, holding that Acts contrary to the first principles of right are void. The principle is unquestionably sound as the governing rule of a Legislature in relation to its own Acts, or even those of a preceding Legislature. It also affords a safe rule of construction for the Courts, in the interpretation of laws admitting of any doubtful construction, to presume that the Legislature could not have intended an unequal and unjust operation of its statutes. Such a construction ought never to be given to legislative language if it be susceptible of any other more conformable to justice ; but if the

words be positive and without ambiguity, I can find no authority for a Court to vacate or repeal a statute on that ground alone. But it is only in express constitutional provisions limiting legislative power, and controlling the temporary will of a majority by a permanent and paramount law, settled by the deliberate wisdom of the nation, that I can find a safe and solid ground for the authority of Courts of Justice to declare void any legislative enactment. Any assumption of authority beyond this would be to place in the hands of a judiciary powers too great and too undefined, either for its own security or the protection of private rights.  *  *  *  Believing that we are to rely upon these and similar provisions as the best safeguards of our rights, as well as the safest authorities for judicial direction, I cannot bring myself to approve of the power of Courts to annul any law solemnly passed, either on an assumed ground of its being contrary to natural equity, or from a broad, loose and vague interpretation of a constitutional provision beyond its natural and obvious sense."

As early as the year 1798 this doctrine was thus emphatically declared by Judge Iredell, in the case of *Calder* v. *Bull*, (3 Dallas, 386): " If, on the other hand, the Legislature of the Union, or any member of the Union, shall pass a law within the general scope of their constitutional power, the Court cannot pronounce it to be void merely because it is in their judgment contrary to the principles of natural justice. The ideas of natural justice are regulated by no fixed standard; the ablest and the wisest men have differed upon this subject, and all that the Court could properly say in such an event would be, that the Legislature, possessed of an equal right of opinion, had passed an Act which in the opinion of the Judges was inconsistent with the abstract principles of natural justice.

" There are, then, but two lights in which the subject can be viewed: First, if the Legislature pursue the authority delegated to them, their acts are valid; second, if they transgress the boundaries of that authority, their acts are invalid. In the former case they exercise the discretion vested in them by the people, to whom alone they are responsible for the faithful discharge of their trust; but, in the latter case they violate a fundamental law which

20

must be our guide whenever we are called upon as Judges to determine the validity of a legislative act."

Again: "We are urged, however," says Chief Justice Black, in *Sharpless* v. *The Mayor of Philadelphia*, (21 Penn. State R. 147) "to go further than this, and to hold that a law, though not prohibited, is void if it violate the spirit of our institutions, or impairs any of those rights which it is the object of a free government to protect, and to declare it unconstitutional if it be wrong and unjust. But we cannot do this. It would be assuming a right to change the Constitution, to supply what we might conceive to be its defects, to fill up every *casus omissus*, and to interpolate into it whatever in our opinion ought to have been put there by its framers. The Constitution has given us a list of the things which the Legislature may not do. If we extend that list, we *alter* the instrument; we become ourselves the aggressors, and violate both the letter and the spirit of the organic law as grossly as the Legislature possibly could. If we can add to the reserved rights of the people, we can take them away; if we can mend, we can mar. If we can remove the landmarks which we find established, we can obliterate them. If we can change the Constitution in any particular, there is nothing but our own will to prevent us from demolishing it entirely.

"The great powers given to the Legislature are liable to be abused. But this is inseparable from the nature of human institutions. The wisdom of man has never conceived of a government with power sufficient to answer its legitimate ends, and at the same time incapable of mischief. No political system can be made so perfect that its rules will always hold it to the true course. In the very best, a great deal must be trusted to the discretion of those who administer it. In ours the people have given larger powers to the Legislature, and relied for the faithful execution of them on the wisdom and honesty of that department, and on the direct accountability of the members to their constituents. There is no shadow of reason for supposing that the mere abuse of power was meant to be corrected by the judiciary. * * * I am thoroughly convinced that the words of the Constitution furnish the only test to determine the validity of a statute, and that all arguments based

on general principles outside of the Constitution must be addressed to the people, and not to us."

The Supreme Court of the United States, in the case of *Satterlee* v. *Matthewson*, (2 Pet. 380) admitted the law under consideration to be unjust, but because not in conflict with an express constitutional provision it was upheld. And, again, in *Fletcher* v. *Peck*, (6 Cranch, 87) it was said that while not transcending the constitutional limits, even the passage of a law by means of corruption would not invalidate it. We conclude, then, upon principle and the weight of authority, that although a law may be opposed to the first principles of right or natural justice, still, if not in conflict with some constitutional provision, State or Federal, the Courts have no power to annul or set it aside. All arguments, therefore, founded upon the injustice or hardships of the Act in question are entirely out of the case.

We may, then, direct our attention to the various constitutional objections made by counsel on behalf of the respondent. And it may as well be stated in the outset that the law cannot be declared unconstitutional unless it be clearly, palpably, and plainly in conflict with some of the provisions of the Constitution. This is a rule recognized by all the Courts, and probably has never been questioned. (*Ash* v. *Parkinson*, January Term, 1869, and cases there cited.) Is it, then, so in conflict with that instrument? It is argued by counsel that it is in several particulars. First, it is claimed that the issuance of the bonds in question is prohibited by section ten, article eight. If so, it follows, as a matter of course, that the tax levied to meet the interest on them is unauthorized and void. But we do not think the language of that section warrants the inference drawn from it, or the construction placed upon it by counsel. It declares that "No county, city, town, or other municipal corporation shall become a stockholder in any joint stock company, corporation, or association whatever; or loan its credit in aid of any such company, corporation, or association, except railroad corporations, companies, or associations." Here is simply a prohibition upon counties, cities, and towns; a restraint imposed upon them respecting subscription to the stock of certain companies or associations. There is no intention whatever mani-

fested to *confer* any right or power upon such organizations: the whole power is embodied in the negative, "shall not become stockholders" or "loan their credit." But railroad companies are especially excepted from the companies or associations mentioned. It is as if those companies were in express terms exempted from the entire provisions of the section, for it simply prohibits aid by means of subscription or loaning credit to any but railroad companies. Now, it was not the intention either to limit or extend the power of a county or town respecting any aid they might choose to give to railroad companies. The exception of these companies from the other associations gives the counties or towns no more right to aid them than they would have had if the section were not embraced in the Constitution at all. It is, then, only by implication that they are allowed to loan their credit to such associations; and nothing is clearer, as we have already endeavored to show, that if not expressly prohibited the Legislature has the power to authorize a county to aid a railroad either by donation or otherwise. Is there anything in this section prohibiting a county to donate money to such companies? Certainly not; but the inference is rather the other way; for to allow them to loan their credit is virtually and substantially allowing a donation, because the right to loan its credit must involve the right to pay any liabilities which may be incurred by that means. And as, practically, the loaning of credit would, in a majority of cases, necessitate the payment by the county or town, it is hardly to be supposed the framers of the Constitution would have allowed this loaning of credit had they thought it desirable to prohibit any donation of money. If it was the intention to deny the right to donation, it is very clear that the right to loan their credit would not have been allowed, as that would simply be an indirect means of permitting the very act which it is claimed was intended to be denied.

Counsel argue that because the right is given to subscribe for stock in such companies and to loan their credit to them, it must be inferred no further or other right or power was intended to be allowed; but as has already been said, no such right is given, except by inference, in this section. Railroad companies are simply

exempted from the provisions of the section, that is all.   No right is given to counties or towns respecting them.

However, the section in question in no wise prohibits the donation of money to any association whatever.   To donate money is one thing; to become a stockholder, or to loan credit, is another.   The framers of the Constitution might very consistently have desired to . protect the counties and towns of the State from the endless complications and uncertain liabilities necessarily attending an interest in companies and associations in general, or becoming surety for them, and still have permitted a donation of money which would be entirely free from everything of the kind.

By the very section preceding that under consideration, the State is prohibited not only from becoming a stockholder in any company or association, but also from donating money to them. Now, if it were the purpose to make the same prohibition respecting counties and towns, why were they not, like the State, expressly forbidden to donate?   The failure to make the prohibition in express terms, under such circumstances, warrants the conclusion that it was not the intention to do so.   Counties and towns, therefore, are not prohibited by this section from donating money to such railroad companies, if to any kind of company or association.

If, however, it be admitted that the first portion of the section, by prohibiting them from becoming stockholders, intended to inhibit donating also, still no such inhibition exists as to railroad companies, for they are exempted from all the prohibitions respecting other companies and associations; the exception or exemption respecting them must by all rules of construction be coëxtensive with the prohibition as to others.

Again, it is claimed the law is repugnant to section eight, article one, which declares that no man shall be deprived of his property without due process of law.   Counsel have entirely misapprehended the purport of this expression, "due process of law."   It does not, as claimed, guarantee a trial by jury in all cases where a citizen's liberty or property is involved.   If so, there could be no commitment for contempt; and no deprivation of property by chancery proceedings, except by the intervention of a jury.   But no lawyer will contend at the present day that a jury can be demanded in cases of

Gibson v. Mason.

that kind. By "due process of law," as used in the Constitution, is simply meant such general legal forms and course of proceedings as were known either to the common law or as were generally recognized in this country at the time of the adoption of the Constitution; committing for contempt by a mere order of Court, and the decision in chancery cases without the intervention of a jury, were as clearly due process of law in such cases as the trial by jury in a common law case.

How then can it be said that the expression "due process of law" guarantees a trial by jury, any more than by the Judge without a jury? Certainly, no new mode of proceeding is required by this provision, nor anything different from that known at the time of its adoption.

Evidently, nothing further was intended by it than to secure to the citizens the usual and ordinary means or course of judicial proceedings generally followed or observed in similar cases at the time it became a part of the fundamental law. But taxes were not either in England or this country (with perhaps the exception of one or two States) collected by the intervention of a jury, nor was it even recognized as the right of the citizen to demand such course of proceeding; on the contrary, it was almost the universal practice to collect them when delinquent by some summary process, such as the seizure of the property of the individual and exposing it for sale. The citizen not being entitled to claim a jury in such cases prior to the adoption of the Constitution, the present mode is as much by "due process of law" in the matter of collecting taxes, as a trial by jury is an ordinary action at law. Such is the conclusion arrived at by the Supreme Court of the United States in the case of *Murray's Lessee* v. *Hoboken Land Co.*, (18 Howard, 272); and upon this and similar provisions in the Constitutions of other States it has been held by every Court where the question has ever been suggested, that it does not prohibit the collection of taxes by summary process, that is, without regular judicial trial and judgment. The power of taxation which is plenary in the Legislature, carries with it the right and power of collecting taxes by a summary process. There are but few States in the Union where they are not so collected; and although the same inhibition is imposed upon the

Federal Government, still its revenue is never collected by due process of law, as understood by counsel; but the officers are generally authorized to seize the property and expose it for sale without trial and judgment, and such course of proceeding has always been upheld. (*Williams* v. *Peyton's Lessee*, 4 Wheat. 77.) In *Parbour* v. *Decatur County*, (9 Geo.) it is said " the right to levy and collect taxes grows out of the necessity of the government, an urgent necessity which admits no property in the citizen while it remains unsatisfied. The right to tax is coeval with all governments. It springs out of the organization of the government. All property is a pledge to pay the necessary debts and expenses of the government." So in *The State* v. *Allen*, (2 McCord, 56) it is observed: " We think that any legal process which was originally founded in necessity, has been consecrated by time, and approved and acquiesced in by universal consent, must be an exception to the right of trial by jury, and is embraced in the alternative " law of the land."

Indeed, this question has been so frequently decided, and the right upheld, that it is no longer an open question, but may be considered finally determined.

It is also provided by the same section, that " private property shall not be taken for public use, without just compensation having been first made or secured." Nor does this provision, in any way, restrict the power of the State to seize, upon summary process, any property for taxes, and that, too, without securing or making compensation therefor. It can hardly be claimed that it does. Were it so, the State would be utterly powerless to support itself, because all taxes collected would unmistakably have to be redistributed to those from whom they were collected. See this question fully discussed in the case of *People* v. *Mayor of Brooklyn*, (3 Comst. 420); the Court thus drawing the distinction between the taking of private property for public use, and the right of taxation with its incidents of taking property in satisfaction of it: " Taxation exacts money or service from individuals, as and for their respective shares of contribution to any public burden. Private property, taken for public use by the right of *eminent domain*, is taken not as the owner's share of contribution to a public burden, but as so much beyond his share. Special compensation is therefore to be made in

the latter case, because the Government is a debtor for the property so taken; but not in the former, because the payment of taxes is a duty, and creates no obligation to repay—otherwise, this is the proper application of the tax.

" Taxation operates upon a community, or a class of persons in a community, on some rule of apportionment. The exercise of the right of *eminent domain* operates upon an individual, and without reference to the amount or value exacted from any other individual or class of individuals." When, therefore, property is taken in satisfaction of a tax, it is not within this constitutional prohibition. But it is argued from this provision, by counsel, if private property cannot be taken for public use without just compensation, it cannot be taken for private use, claiming that the tax sought to be collected is simply for a private purpose; that it is levied for the benefit of private individuals; or that it is taking the property of one citizen and giving it to another. If this were a fact, we should unhesitatingly declare the ·law unconstitutional; but we intend to show that the tax is levied not for a private but a public purpose, and for the benefit of the community at large—hence, a consideration of this point is rendered unnecessary.

It is next argued that this law is repugnant to section twenty, article four, which prohibits the Legislature from passing local or special laws upon certain subjects, among which is that for the assessment and collection of taxes for State, county, and township purposes.

By this provision it was evidently intended simply to inhibit local or special laws, respecting or regulating the manner or mode of assessing and collecting taxes.

Assessment, as used in this section, evidently has reference to the duties of the subordinate officer, known under our laws as an Assessor, whose duty it is to ascertain the value of the taxable property, and determine the exact amount which each parcel or individual is liable for. The word " for," too, must mean—with respect to, or with regard to, which is a definition given to it by lexicographers—and thus the language of the section will read: With respect to or regard to the assessment and collection of taxes for State, county, and township purposes. The law under consid-

eration, however, contains no provision whatever respecting the assessment or collection of the tax complained of, in the sense in which those words are employed in the Constitution. It simply directs the levy of the tax, and in no way regulates the manner in which the proportion of each person is to be ascertained that is assessed; but this, and the method of collecting, is left to be governed by the general revenue law.

It clearly could not have been intended by the framers of the Constitution to require a general law for the levy of a tax for a special purpose in a county. As in a case of this kind, when no county but that of Ormsby is required to levy a tax, and this for a special purpose, and the amount to be levied is necessarily fixed—how could a general law be enacted to meet the necessities of the case, without requiring all the counties of the State to levy a like tax? It could not, with the construction which counsel for respondent place upon this section.

We are clearly of opinion that the constitutional provision simply prohibits special legislation regulating those acts which the assessors and collectors of taxes generally perform, and which are denominated "assessment" and "collection of taxes;" and that it does not inhibit the Legislature from authorizing or directing the County Commissioners from levying a special tax by the passage of a local law.

All the constitutional objections made by counsel have thus been noticed and found untenable. Here we might rest the case, affirming the validity of the law upon the absence of all constitutional provisions repugnant to it. But our conclusion upon the main question in the case—the legislative power to direct the issuance of these bonds, and to levy taxes for the purpose of paying them—need not be placed upon this ground alone, for it is an authority clearly embraced within the taxing power which is expressly granted to the Legislature. Its power upon this subject is full and complete. (*Ex parte Crandall*, 1 Nev. 294.)

"The power of legislation and consequently of taxation," says Chief Justice Marshall, "operate on all the persons and property belonging to the body politic. This is an original principle, which has its foundation in society itself. It is granted by all for the

benefit of all. It resides in the government as part of itself, and need not be reserved where property of any description, or the right to use it in any manner, is granted to individuals or corporate bodies. However absolute the right of an individual may be, it is still in the nature of that right that it must bear a portion of the public burden; and that portion must be determined by the Legislature. This vital power may be abused: but the interest, wisdom, and justice of the representative body, and its relation with its constituents, furnish the only security against unjust and excessive taxation as well as against unwise legislation." And, again, the same eminent Judge, in the case of *McCulloch* v. *State of Maryland*, (4 Wheat. 316) said respecting the same question: "It is admitted that the power of taxing men and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax, then, government acts upon its constituents. This is, in general, sufficient security against erroneous and oppressive taxation. The people of a State, therefore, give to their government a right of taxing themselves and their property; and as the exigencies of the government cannot be limited, they prescribe no limit to the exercise of this right—resting confidently in the interest of the Legislature, and the influence of its constituents over their representatives, to guard them against its abuse."

This language is perfectly applicable and entirely true respecting the legislative power of this State; the power of taxation being given to it, and no restriction whatever placed upon its exercise, except that it is required to make all assessments of taxes equal and uniform, and also to tax mining property in a designated way. But so far as the extent of taxation is concerned, or the purposes for which taxes may be levied, there is no limit or restriction placed upon the power.

We do not wish to be understood as holding that the Legislature may enforce burdens upon or collect money from the citizens for any object that it may choose; for if it be imposed for a purpose not public in its nature—that is, if it be not strictly a tax which is

defined to be " a rate or sum of money assessed on the person or property of a citizen by government *for the use of the nation or State*—then clearly it would be an unwarrantable exercise of power. But if it be levied for the purpose of furthering any public enterprise, or aiding any public undertaking whereby the community or public as such will be benefited, it would clearly be otherwise. And, generally, the Legislature is to decide upon the question as to whether the public welfare will be furthered by any particular enterprise or improvement. (18 Wend. 9.) "The Legislature is not," says the Court of Appeals of New York, " confined in its appropriation of the public moneys, or of the sums to be raised by taxation in favor of individuals, to cases in which a legal demand exists against the State. It can thus recognize cases founded in equity and justice in the largest sense of these words, or in gratitude or charity. Independently of express constitutional restrictions, it can make appropriations of money whenever the public well-being requires or will be promoted by it, and it is the judge of what is for the public good." (*Town of Guilford* v. *The Supervisors of Chenango County,* 13 N. Y. R. 149.)

The full power of taxation must necessarily carry with it the right to determine the purposes for which it must be levied. So it is held that a tax must be upheld, unless it be levied for an object in which the community or public palpably have no interest, where it is perfectly apparent at first blush that it is imposed simply for the benefit of individuals. (*Cheaney* v. *Hooser,* 9 B. Monroe, 330; 21 Penn. S. R. 147.)

The question necessarily arises, then, whether the object for which this tax is levied is rather private than public; an enterprise not beneficial to the people of Ormsby County; or whether it is one of those public improvements whereby the County is directly benefited, and which is generally recognized as a proper object for public aid. It undoubtedly belongs to the latter class. A railroad is a public highway, affording facilities for easy and rapid travel to the public, and aiding in developing the resources of the country, and making markets for its productions easy of access. That private individuals are to own the road and receive the tolls in no wise impairs or diminishes these advantages to the public.

The question for the Legislature to determine in such cases is simply whether the work when perfected will be of sufficient advantage to the public to warrant public aid being given to it; not whether the public are to receive all the benefits from it. Indeed, it has been held in every State in the Union, where a railroad has been built, that it is a public work, and as a consequence, the right to take private property against the will of the owner for the purpose of securing a way (paying a just compensation therefor) has, in every instance in which a railroad has been built in the United States, been granted.

If a railroad were not considered or held to be a public work, private property could not be so taken ; for, as has already been stated, such property can only be taken for *public uses*, even where a compensation is paid. A railroad must, then, whenever the right to take private property is given to it, (which is doubtless invariably the case) be held to be a public work, and for the public benefit. And it must be borne in mind that there is no difference in this respect between a road built by private capital and owned by individuals, or one built by the public itself. This very question is fully and ably discussed in the case of *Beekman* v. *The Saratoga R. R. Co.*, (3 Paige, 45) by Chancellor Walworth, who said: " The right of eminent domain does not, however, imply a right in the sovereign power to take the property of one citizen and transfer it to another, even for a full compensation, where the public interest will be in no way promoted by such transfer. And if the Legislature should attempt thus to transfer the property of one individual to another, where there could be no pretense of benefit to the public by such exchange, it would probably be a violation of the contract by which the land was granted by the government to the individual, or to those under whom he claimed title, and repugnant to the Constitution of United States. But if the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the Legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of *eminent domain*, and to authorize an interference with the private rights of individuals for that purpose. (Kent's Com. 340.) It is upon this principle that

the Legislatures of several of the States have authorized the con-
demnation of lands of individuals for mill sites, where from the
nature of the country such mill sites could not be obtained for the
accommodation of the inhabitants without overflowing the lands
thus condemned. Upon the same principle of public benefit, not
only the agents of the government, but also individuals and corpo-
rate bodies, have been authorized to take private property for the
purpose of making public highways, turnpike roads, and canals; of
erecting and constructing wharves and basins; of establishing fer-
ries; of draining swamps and marshes; and of bringing water to
cities and villages. In all such cases the object of the legislative
grant of power is the public benefit derived from the contemplated
improvement, whether such improvement is to be effected directly
by the agents of the government, or through the medium of corpo-
rate bodies, or of individual enterprise.

"And according to the opinion of Chief Justice Marshall, in the
case of *Wilson* v. *The Black Bird Creek Marsh Company*, (2
Peters, 251) measures calculated to produce such benefits to the
public, though effected through the medium of a private incorpora-
tion, are undoubtedly within the powers reserved to the States, pro-
vided they do not come in collision with those of the General
Government. It is objected, however, that a railroad differs from
other public improvements, and particularly from turnpikes and
canals, because travelers cannot use it with their own carriages,
and farmers cannot transport their produce in their own vehicles;
that the company in this case are under no obligations to accommo-
date the public with transportation, and that they are unlimited in
the amount of tolls which they are authorized to take. If the
making of a railroad will enable the traveler to go from one place
to another without the expense of a carriage and horses, he derives
a greater benefit from the improvement than if he was compelled
to travel with his own conveyance over a turnpike road at the same
expense. And if a mode of conveyance has been discovered by
which the farmer can procure his produce to be transported to
market at half the expense which it would cost him to carry it
there with his own wagon and horses, there is no reason why the
public should not enjoy the benefit of the discovery. And if any

individual is so unreasonable as to refuse to have the railroad made through his lands, for a fair compensation, the Legislature may lawfully appropriate a portion of his property for this public benefit, or may authorize an individual or corporation thus to appropriate it, upon paying a just compensation to the owner of the land for the damage sustained. The objection that the corporation is under no legal obligation to transport produce or passengers upon the road, and at a reasonable expense, is unfounded in fact. The privilege of making a road and taking tolls thereon is a franchise, as much as the establishment of a ferry or a public wharf and taking tolls for the use of the same. The public have an interest in the use of the railroad, and the owners may be prosecuted for the damages sustained, if they should refuse to transport an individual or his property, without any reasonable excuse, upon being paid the usual rate of fare. The Legislature may also from time to time regulate the use of the franchise and limit the amount of toll which it shall be lawful to take, in the same manner as they may regulate the amount of tolls to be taken at a ferry, or for grinding at a mill, unless they have deprived themselves of that power by a legislative contract with the owners of the road." See also, *Bloodgood* v. *M. & H. R. R. Co.*, (18 Wend. 9).

That a railroad is a work in which the public are interested to the extent that a tax imposed in aid of it must be upheld, is a proposition upon which there is no diversity of authority whatever. (*Buffalo & N. Y. R. R. Co.* v. *Brainard*, 9 N. Y. 100 ; *C. W. & Z. R. R. Co.* v. *Clinton Co.*, 1 Ohio State R. 77 ; *City of Bridgeport* v. *Housatonuc R. R. Co.*, 15 Conn. 475 ; *Thomas* v. *Leland et als.*, 24 Wend. 65 ; *Slack* v. *Maysville & Lexington R. R. Co.*, 13 B. Monroe, 1 ; *Talbot* v. *Dent*, 9 B. Monroe, 526 ; *Bank of Rome* v. *Village of Rome*, 18 N. Y. 38 ; 9 Indiana, 74 ; 24 Barbour, 446.)

If money may be raised by means of taxation for such purpose, it will not be denied that bonds may be issued for the same purpose, to be paid by means of taxation. We conclude that the Legislature was fully authorized to direct the issuance of the bonds in question, and to levy a tax to meet their payment as is done in the law under consideration.

The next question to be determined is whether the tax complained of was prematurely levied by the Commissioners. *It is argued that no tax should be levied or assessed under this law until the bonds were issued, and as they could not be and were not issued until after the levy, the latter act was invalid. But there is nothing in the law prohibiting the Commissioners from levying a tax to meet the interest on the bonds before the issuance of them. The bonds, it is true, are not authorized to be issued until the completion of the road through the County of Ormsby; but suppose the Commissioners should be perfectly satisfied that they would be required to issue them shortly after the time for levying taxes, what authority is there in this act for the conclusion that they could not upon such belief levy the tax? If this could not be done the bonds might be issued and no money in the treasury to meet the first year's interest when it became due, which would be the case here were it held that no levy of taxes could be made until the bonds were issued, for it is clear no special levy can be made. Thus the tax provided by this law could not be levied until the next year, and so the interest for the first year would be unprovided. Now it is very certain the Legislature did not intend any such result. The principal and interest of these bonds are not different from any other county liability, which the Commissioners may anticipate by levying a tax before it becomes due, for the purpose of paying it. If the Commissioners were satisfied that the county would become liable to pay interest on these bonds before another tax could be levied and collected, what is there in the law prohibiting them from providing for it like any other anticipated liability? The interest on these bonds for the first year is as absolutely required to be paid as for any subsequent year. Are we to conclude that the Legislature has made this requirement and still prohibited the only means by which it may be accomplished? Certainly not. It is a rule of construction that when anything is required to be done, the usual means may be adopted for performing it.

So also it is always the first great object of the Courts in interpreting statutes, to place such construction upon them as will carry out the manifest purpose of the Legislature, and this has been done in opposition to the very words of an Act.

Can there be any possible doubt that it was the intention of the Legislature in the adoption of the law in question, to require the payment of the first year's interest on the bonds as it it became due ? and if so, can it be claimed that it denied the Board of County Commissioners the power to carry out that intention ?   It seems to us not.   The tax was therefore properly levied.

For the reasons here stated, we conclude the injunctions in both cases were unauthorized; and must be dissolved.

It is so ordered.

By the Court, JOHNSON, J. :

In this case the views of my associates, as presented in the opinion of the Chief Justice, command my unqualified approval, except in respect to the last point noticed in the opinion—the levy of the one per cent. interest tax : for my convictions lead me to the adverse conclusion for the reason that, as I interpret the law, it gave to this Board when the levy was made, on or about the seventeenth of April, 1869, no authority whatever to make the levy ; and necessarily, the conclusion of the majority of the Court rests upon the converse of this proposition.   In the Act concerning Boards of County Commissioners, (Stats. 1864–5, 258, Sec. 8). they are empowered " to levy, for the purposes prescribed by law, such amount of taxes on the assessed value of real and personal property in the county as may be authorized by law."   By section one, of the Supplemental Revenue Act of April 2d, 1867, they are authorized " to levy an *ad valorem* tax for county purposes, not exceeding the sum of one hundred and fifty cents on each one hundred dollars value of all taxable property in the county."  *   *   *   Section two of the same Act authorizes and empowers such " Board of each county, annually, prior to the third Monday in April, unless otherwise provided by special Act, to levy and assess the amount of taxes that shall be levied for county purposes."      *      *      *

Thus we see that the *maximum* rate of taxation for county purposes, unless there be some special tax otherwise provided for, is fixed at one and a half per cent. upon the assessed value of the property ; and within this limitation the levy must be made by the Board.   This brings us to the Act of January 27th, 1869, author-

izing the issuance of bonds to the Railroad Company, under which must be found, if at all, the authority of the Board to levy the additional tax of one per cent. The Act is fully set out in the leading opinion; and upon inspection, it will be seen that the donation of Ormsby County Bonds is upon conditions: That whenever, within eighteen months from the passage of this Act, the Virginia and Truckee Railroad Company * * shall have completed the construction of a first-class iron railroad between certain points in Ormsby County, and the same shall be in complete readiness to receive the rolling stock proper therefor, the Board of Commissioners of said county are authorized and directed to issue to said Railroad Company the bonds of such county, to the amount of two hundred thousand dollars—the principal thereof payable at stated periods, and bearing interest at the rate of seven per cent. per annum, semiannually.

Section *three* provides the mode of procedure in determining whether the conditions assumed by the Railroad Company have been complied with; and " said Board, on being so satisfied, shall without delay, prepare, issue, and deliver the bonds." In section *four* we reach the taxation clause, under which the Board assumed to act in making the levy in question: " The said Board of County Commissioners are hereby authorized and required to levy and collect annually, until all of said bonds issued under the provisions of this Act shall have been fully paid as provided for, a tax of one per cent. upon all taxable property of Ormsby County, to be applied exclusively to the payment of the principal and interest of said bonds to be issued as herein provided." * * * Now it is conceded that when the levy of the tax was made, no bonds had been issued—nor could they be, as the road was but partially constructed. No debt of principal or interest was chargeable against the county, calling for the payment of interest. By what authority, then, could the Board proceed to levy the tax? Look at the words of the Act under which the levy is justified: Not " bonds which may be issued," or which " are authorized to be issued;" but that this special tax " shall be levied and collected annually until said bonds *issued*," etc., meaning thereby that whenever the bonds were issued, an annual tax should be levied and collected. This construction is in

21

Gibson v. Mason.

harmony with the tense of the word "issued," and is strictly in keeping with the conditions of the Act authorizing the donation: that bonds shall be issued and the property of the county subjected to taxation for the payment of the principal and interest, *whenever*, within eighteen months from the date of the Act, a given character of road shall have been constructed. I take it that if a different rule was intended, or if the time when this tax was first to be levied was to be in any degree discretionary with the Board or dependent upon its judgment as to when the bonds would probably be demand able, that then the Act would, as it does in the matter of the final acceptance of the road, have contained some evidence of such intention, which certainly it has not. Nor is there any analogy between this and the ordinary indebtedness of a county. It is well known, that the general fiscal concerns of the county are for the most part conducted without ready money. Debts are contracted, liabilities incurred, and warrants drawn upon its treasury, in anticipation of its revenues for the current year. The rates of taxation also are fixed by the Board of Commissioners, with regard to the probable expenditures as well as of receipts—all of which, however, has the direct sanction of law, and the authority cannot be questioned. Certainly, the cases are very unlike.

I have no doubt but that the Act in question was framed with the expectation that it would secure the payment of the interest on the bonds as it fell due, and if the levy made by the bonds should be held invalid, it doubtless would postpone the payment of the first, and perhaps the second installment of interest. But, in my judgment, with all possible deference to the ruling of my associates on this point, the Act admits of no construction that can uphold the levy.

From these views it follows, that upon the question of the levy of the tax my conclusions are, that it was without authority of law and void. Otherwise, I concur in the opinion of the Chief Justice.