[No. 2293]

## CITY OF RENO (A MUNICIPAL CORPORATION), PETITIONER, *v.* C. H. STODDARD, AS EX' OFFICIO CITY AUDITOR OF THE CITY OF RENO, AND D. W. DUNKLE, AS EX OFFICIO CITY TREASURER OF THE CITY OF RENO, RESPONDENTS.

[167 Pac. 317]

1. MUNICIPAL CORPORATIONS — NATURE OF POWERS — CONTROL BY LEGISLATURE.
    Cities are mere instrumentalities of the state for the convenient administration of government, and their powers may be qualified, enlarged, or withdrawn at the pleasure of the legislature.

2. MUNICIPAL CORPORATIONS—FUNDS—CONTROL BY LEGISLATURE.
    The revenues of a city raised by taxation, though levied for specific public purposes, may be applied by the legislature to other municipal uses, subject to constitutional limitations.

3. MUNICIPAL CORPORATIONS—REPEAL—OMISSION IN AMENDING ACT.
    Stats. 1915, c. 184, sec. 5, amending charter of city of Reno of March 16, 1903 (Stats. 1903, c. 102, as amended by Stats. 1905, c. 71) art. 12, sec. 10, by empowering the city council to levy and collect for general purposes a certain tax on the assessed value of real and personal property, 15 per cent of which should be set aside in a special fund to provide for a sewage-disposal plant or system for the city, was. as to such special fund, repealed by Stats. 1917, c. 76, amending section 5 "to read as follows," and omitting the provision for such special fund.

4. MUNICIPAL CORPORATIONS—SPECIAL FUND—REPEAL OF STATUTE—EFFECT.
    The provision of the last amendatory act that all moneys held in any special fund might be transferred to the city's general fund authorized the transfer of the special sewage-disposal fund created by Stats. 1915, c. 184, sec. 5, to the city's general fund.

5. CONSTITUTIONAL LAW—MOTIVE OR POLICY OF LEGISLATURE—POWER OF COURT.
    The motives of the legislature are not subject to judicial inquiry, and its will is above the judgment of the courts as to the wisdom or policy of legislation.

ORIGINAL PROCEEDING in *mandamus* by the City of Reno against C. H. Stoddard, as ex officio City Auditor, and D. W. Dunkle, as ex officio City Treasurer, of the City of Reno. **Writ granted** (McCARRAN, C. J., dissenting).

*L. D. Summerfield,* City Attorney of Reno, for Petitioner:

In one or two cases where the legislature has authorized the transfer of money raised by taxation from one fund to another, and the courts have held against the transfer, it will be found upon investigation that there was a constitutional prohibition against such procedure. The fact that the constitutional provision is necessary to prevent the legislature from so acting indicates strongly that in the absence of such a provision such transfers may be made. However, in the case at bar, strictly speaking, the question of the transfer of a special fund raised by a special tax is not involved. The tax here was levied and collected for general purposes. After being raised on that basis, the legislature directed a certain portion to be set aside for a certain purpose. Having the power to do this in the first instance, it had the further power to authorize the money so set apart to be transferred to the general fund, to be used for other general purposes.

"A statute must be construed, if possible, so as to give it force and effect." (*Hettel* v. *First Judicial District Court,* 30 Nev. 382, 96 Pac. 1062, 133 Am. St. Rep. 731.) "Courts will construe the language of a statute so as to give force and effect to, rather than to nullify, it." (*State* v. *Martin,* 31 Nev. 493, 103 Pac. 840.) "Particular provisions of charters should be read and construed in the light of the whole instrument, of all preceding charters, of the general legislation of the state, and of the object of the legislature in the creation of municipalities." (1 Dillon, Mun. Corp., sec. 235.)

An examination of the history of subdivision 3, section 10, article 12, will show that the first portion thereof has always authorized the levy and collection of a tax "for general purposes." (Stats. 1905, p. 112; 1911, p. 57; 1913, p. 329; 1915, p. 256; 1917, p. 102.)

A municipality, under delegated authority, may do any act which the legislature itself can do, subject to constitutional limitations. (28 Cyc. 271, 310.)

Whether the transfer authorized be good or bad, on governmental principles, is not a question for the court, but one to be settled between the people and their representatives, whether those representatives be the members of the legislature or the city council of their political subdivision. (*Sharpless* v. *Mayor of Phila.*, 21 Pa. St. 147, 59 Am. Dec. 759; *State ex rel. Police Commissioners* v. *County Court*, 34 Mo. 546.)

*James T. Boyd* and *Roy W. Stoddard*, for Respondents:

This is an application, on the petition of the city of Reno, against C. H. Stoddard and D. W. Dunkle, respectively ex officio auditor and ex officio city treasurer, to compel the transfer to the general fund of moneys raised for a special purpose, namely, to provide for a sewage-disposal plant for the city. (Stats. 1915, p. 256.)

In connection with this act or amendment to the city charter, it is well to bear in mind the provisions of an act to prevent the pollution of the waters of rivers (Stats. 1915, p. 361) in arriving at a determination of the purpose and intention of the amendment of the city charter in 1915, and that the amendment of 1915, above referred to, makes it mandatory for the city of Reno to set aside the amount specified for the special purpose indicated.

The legislature of 1917 (Stats. 1917, p. 102) amended the amendment of 1915, by providing that "all moneys now held in any special fund not herein provided for may be transferred to the general fund of the city"; and it is for this court to determine what was the intention of the legislature in passing the amendment of 1917, and whether the construction to be placed upon the amendment authorizes the transfer of the fund in controversy. "Generally, taxes levied for one purpose cannot be applied to another." (28 Cyc. 1730.) "Where a tax expressly authorized by a valid statute for the payment of interest on county bonds has been levied and collected, the fund so created is

dedicated to a special purpose or impressed with a trust."
(*Coler* v. *Board*, 89 Fed. 257.) "Courts are bound to
uphold a prior law, if it and a subsequent one may sub-
sist together, or if it be possible to reconcile the two
together, and, unless the latter statute is manifestly
inconsistent with and repugnant to the former, both
remain in force." (*State* v. *La Grave*, 23 Nev. 373; *State*
v. *County Court*, 101 Pac. 907; *Tilden* v. *Esmeralda County*,
32 Nev. 319; *O'Neal* v. *New York M. Co.*, 3 Nev. 141; *State*
v. *Oldfield*, 22 Okl. 863, 98 Pac. 925.)

By the Court, SANDERS, J.:

The city of Reno petitions this court for a writ of
*mandamus* to compel C. H. Stoddard, as ex officio auditor
of said city, and D. W. Dunkle, as ex officio treasurer
thereof, to forthwith transfer all moneys held in a
special fund to provide a sewage-disposal plant or
system for the said city to the general fund of said city.
The facts are as follows:

The legislature in 1915 (Stats. 1915, p. 256) amended
subdivision 3 of section 10 of article 12 of the charter
of the city of Reno. Section 5 of the amendatory act
declares:

That section 10 of article 12, with other sections of
the act, entitled "An act to incorporate the town of Reno,
and to establish a city government therefor," approved
March 16, 1903, as amended by Stats. 1905, p. 112, "are
hereby amended so as to read as follows:

"SEC. 10. The city council, among other things, shall
have power :     *     *     *

"*Third*—To levy and collect annually for general pur-
poses a tax of not to exceed three-quarters of one per
cent upon the assessed value of all real and personal
property within the city, and which is by law taxable
for state and county purposes, fifteen per cent of which
shall be set aside in a special fund to provide for a
sewage-disposal plant or system for the city, and for no
other purpose, until such time as said sewage-disposal

plant or system shall be actually installed and paid for; and in addition thereto to levy and collect annually a tax of not to exceed one-quarter of one per cent, upon the assessed value of all real and personal property within the city, which is by law taxable for state and county purposes, to provide a fund for the payment of the interest on the bonds of the city outstanding, and that may be lawfully issued and sold hereafter, and to provide a fund for the payment of the principal of such bonds, and for the redemption thereof as they shall mature, and for no other purpose."

The legislature in 1917 (Stats. 1917, p. 102) again amended subdivision 3 of section 10 of article 12 of said act by declaring:

That said section "is hereby amended so as to read as follows:

"SEC. 10. The city council, among other things, shall have power:    *    *    *

"*Third*—To levy and collect annually for general purposes a tax of not to exceed three-quarters of one per cent upon the assessed value of all real and personal property within the city and which is by law taxable for state and county purposes; and in addition thereto to levy and collect annually a tax of not to exceed one-quarter of one per cent upon the assessed value of all real and personal property within the city, which is by law taxable for state and county purposes, to provide a fund for the payment of the interest on the bonds of the city outstanding, and that may be lawfully issued and sold hereafter, and to provide a fund for the payment of the principal of such bonds and for the redemption thereof as they shall mature, and for no other purpose; *provided,* that all moneys now held in any special fund not herein provided for may be transferred to the general fund of the city."

It is admitted that from March 22, 1915, there has been set aside by respondents, as ex officio officers of said city, from taxes levied and collected for general

purposes, in a special fund to provide for a sewage-disposal plant or system for Reno, in pursuance of the amendment of 1915, the sum of $25,895.40, and that this sum still remains in said special fund. It is admitted that no steps have been taken by the city since said date to erect a sewage-disposal plant or system; that there are no creditors, or persons who have any vested interest in or to said moneys so set aside; that from March 22, 1915, to and including March 13, 1917, the date of the last amendment, there were no funds of the city in its treasury, or elsewhere, derived from the levy or collection of a tax or taxes upon assessed value of the real and personal property within said city, and segregated in accordance with the charter of said city, save and except such funds as were so derived and segregated in accordance with subdivision 3, section 10 of article 12, as amended by the legislature in 1915 and 1917. On July 9, 1917, the city council of Reno ordered respondents to transfer all moneys held in said special fund to provide a sewage disposal plant or system for said city to the general fund. The respondents refused, and still refuse, to make the transfer. The petitioner bases its claim for the transfer of said moneys upon the amendatory act of 1917. The respondents justify their refusal to make the transfer upon the amendatory act of 1915, and are of the opinion that said moneys of right belong to said special fund, and under the limitations imposed by the act of 1915 cannot be transferred.

1, 2. Cities are mere instrumentalities of the state, for the convenient administration of government; and their powers may be qualified, enlarged, or withdrawn at the pleasure of the legislature, and the revenues of a city raised by taxation, though levied for specific public purposes, are so far subject to the legislative will, that by it they may be applied to other uses of the municipality, subject, of course, to constitutional limitations. (*Board of Commissioners* v. *Lucas*, 93 U. S. 108, 23 L. Ed. 822; *People ex rel.* v. *Power*, 25 Ill. 187; *State ex rel.* v. *Board of Education*, 141 Mo. 45, 41 S. W. 924; Cooley's Mun.

Corp., sec. 25, p. 76; Dil. Mun. Corp., sec. 1381, 1382, 5th ed.)

Our constitution provides that:

"The legislature shall provide for the organization of cities and towns by general laws; and restrict their powers of taxation, assessment, borrowing money, contracting debts, and loaning their credit, except for procuring supplies of water." (Sec. 8, art. 8, Const. Nevada; Rev. Laws, 345.)

3. It is obvious that the restrictions imposed by the amendatory act of 1915 are retained in the amendatory act of 1917, except the requirement that 15 per cent of the tax levied and collected for general purposes shall be set aside in a special fund to provide for a sewage-disposal plant or system for the city, which is omitted.

It is, no doubt, a well-settled rule in the construction of statutes, that where a statute provides (as in this case) that a certain former statute "is hereby amended so as to read as follows," any provision of such former statute which is not found in the new statute is repealed. There is a negative necessarily implied that such eliminated portion shall no longer be in force. (1 Sutherland, Stat. Const., sec. 246; Black on Int. of Laws, sec. 133, 23 Am. & Eng. Ency. p. 735; *State* v. *Horton,* 21 Nev. 306, concurring opinion; *Ratcliff* v. *People,* 22 Colo. 75, 43 Pac. 353; *State* v. *Routh,* 61 Minn. 205, 63 N. W. 621; *Helena* v. *Rogan,* 27 Mont. 135, 69 Pac. 709; *Guaranty Trust Co.* v. *Troy Steel Co.,* 68 N. Y. S. 915; *Fargo* v. *Ross,* 11 N. D. 369, 92 N. W. 449; *Sofers* v. *Commonwealth,* 97 Va. 759, 33 S. E. 384; *Nudgett* v. *Liebes,* 14 Wash. 482, 45 Pac. 19; *Ashland Water Company* v. *Ashland County,* 87 Wis. 209, 58 N. W. 235.)

4. The omitted provision being repealed or abrogated by its omission from the act of 1917, the question arises, what becomes of the special fund of $25,895.40 already set aside to provide for a sewage-disposal plant or system for the city? This is answered by the proviso engrafted on the amendatory act of 1917: *"Provided,* that all moneys now held in any special fund not herein pro-

vided for may be transferred to the general fund of the city." It is, in effect, admitted by the pleadings that the language of the proviso can relate only to the "special fund" authorized by the act of 1915. The proviso, therefore, is an affirmative declaration to the effect that the city may transfer the fund in question to the general fund, and it is so manifestly inconsistent with and repugnant to the former act, when the city council has acted, that the two amendments cannot stand together.

5. It is unnecessary to extend this opinion, but it is insisted by respondents that by reason of contemporaneous legislation the city is brought under the ban of the general law relative to the pollution of the public streams of this state by the towns and cities thereof, and that if the said special fund be transferred to the general fund the city will be subjected to a suit to restrain it from polluting the waters of the Truckee River (Stats. 1917, p. 51) and will work great harm and threaten the health of the residents and public in general of the city of Reno.

The anti-pollution statutes are not involved in this proceeding, except as an incident to the cause which may have moved the legislature in 1915 to exercise its prerogative and amend the charter of the city so as to provide a sewage-disposal plant or system for the benefit of the inhabitants of the municipality, or prevent the pollution of the waters of the Truckee River. However provident the legislation of 1915 may have been, or however improvident the legislation of 1917 may be in the opinion of respondents, it constitutes no defense to this application for a writ of *mandamus*. The motives of the legislature are not subject to judicial inquiry. Its will is supreme to that of the judgment of courts as to the wisdom or policy of its legislation.

The writ should be granted.

It is so ordered.

COLEMAN, J., concurring:

There is no doubt but that it was the intention of the legislature, by the act of 1917, to repeal that portion of the act of 1915 which provided for the setting aside of a certain portion of the revenue collected from property within the city of Reno as a fund to pay for the construction of a sewage-disposal plant. The dissenting opinion of the learned chief justice concedes as much. This much being conceded, it seems to me that the force of the argument presented in the dissenting opinion is lost. In other words, if, notwithstanding the policy of the state as to preventing the pollution of the public streams, the legislature repealed the provision in the act of 1915 providing for the creation of the fund for the construction of the sewage-disposal plant, why should that general policy enter into consideration in determining the force and effect of the portion of the amendatory act of 1917 which empowers the city to transfer the special fund to the general fund? The legislature, having decided to repeal that portion of the act of 1915 providing for the creation of a fund for a sewage-disposal plant, for reasons which no doubt seemed good to it, concluded to leave to the discretion of the city what disposition should be made of the money theretofore raised and placed in the fund. This seems to me to have been the clear intention of the legislature.

The learned chief justice contends that the acts of 1915 and 1917 amending the charter of the city of Reno and the various general acts relative to the pollution of the public streams of the state are *in pari materia*, and should be read together. I cannot agree with this view. In my opinion they are not *in pari materia*. The acts dealing with the question of the pollution of the public streams relate to one general subject, while the acts amending the charter of the city of Reno pertain to another.

McCarran, C. J., dissenting:

I dissent.

The question presented here is one which turns entirely upon a construction of statutes. Subdivision 3 of section 10 of article 12 of the charter of the city of Reno, as amended in 1915, in dealing with the powers and duties of the city council, provides:

"*Third*—To levy and collect annually annually for general purposes a tax of not to exceed three-quarters of one per cent upon the assessed value of all real and personal property within the city, and which is by law taxable for state and county purposes, fifteen per cent of which shall be set aside in a special fund to provide for a sewage-disposal plant or system for the city, and for no other purpose, until such time as said sewage-disposal plant or system shall be actually installed and paid for; and in addition thereto to levy and collect annually a tax of not to exceed one-quarter of one per cent upon the assessed value of all real and personal property within the city, which is by law taxable for state and county purposes, to provide a fund for the payment of the interest on the bonds of the city outstanding, and that may be lawfully issued and sold hereafter, and to provide a fund for the payment of the principal of such bonds, and for the redemption thereof as they shall mature, and for no other purpose. (Stats. 1915. p. 256.)

It appears that, pursuant to the provisions of this statute, there was collected by way of taxation and placed in the special fund the sum of $25,895.40. This money is now held by the respondents, in their official capacity, in the special fund to provide for a sewage-disposal plant or system for the city of Reno; and it is the refusal of of the respondents to transfer these moneys in the general fund that gives rise to these extraordinary proceedings.

Subdivision 3 of section 10 of article 12 of the charter of the city of Reno was again amended by the legislature of 1917, and by the amended section it is provided that the city council of the city of Reno shall have power:

"To levy and collect annually for general purposes a tax of not to exceed three-quarters of one per cent upon the assessed value of all real and personal property within the city and which is by law taxable for state and county purposes; and in addition thereto to levy and collect annually a tax of not to exceed one-quarter of one per cent upon the assessed value of all real and personal property within the city, which is by law taxable for state and county purposes, to provide a fund for the payment of the interest on the bonds of the city outstanding, and that may be lawfully issued and sold hereafter, and to provide a fund for the payment of the principal of such bonds, and for the redemption thereof as they shall mature and for no other purpose; *provided,* that all moneys now held in any special fund not herein provided for may be transferred to the general fund of the city." (Stats. 1917, p. 102.)

The contention of petitioner here is based entirely upon the latter part of the section of the charter as amended in 1917:

"*Provided,* that all moneys now held in any special fund not herein provided for may be transferred to the general fund of the city."

Respondent asserts that there is no other special fund, and that the language here used refers by implication to the special fund created by the amendment of 1915, by reason of which said amendment the moneys so collected are now held in the special sewage fund.

We are here asked to interpret the statute, and from such interpretation we are asked to construe the amendment of 1917 to the effect that inasmuch as the legislature discontinued the tax for the special purpose, or discontinued the segregation of a percentage of the tax collected for general purposes into a special fund for a special purpose, therefore by implication we are to say that the fund so established was intended to be transferred to the general fund.

In order to ascertain the intention of the legislature, we may with propriety consider other laws existing on

correlative subjects at the time this amendment to the city charter was enacted.

With a view to arriving at the intention of the legislature, we deem it proper to dwell at some length upon the history of legislation in this state bearing upon the subject for which the special fund was in this instance created, namely, the removal of the sewage of the city of Reno from the Truckee River.

In 1903 the legislature passed an act entitled "An act to prevent the pollution or contamination of the waters of the lakes, rivers, streams, and ditches in the State of Nevada, prescribing penalties, and making an appropriation to carry out the provisions of this act."

The act, *inter alia,* provides:

"SECTION 1. Any person or persons, firm, company, corporation, or association in this state, or the managing agent of any person or persons, firm, company, corporation, or association in this state, or any duly elected, appointed or lawfully created officer of any county, city, town, municipality, or municipal government in this state, who shall deposit or who shall permit or allow any person or persons in their employ or under their control, management, or direction to deposit in any of the waters of the lakes, rivers, streams and ditches in this state any sawdust, rubbish, filth, or poisonous, or deleterious substance or substances, liable to affect the health of persons, fish, or live stock, or place or deposit any such deleterious substance or substances in any place where the same may be washed or infiltered into any of the waters herein named, shall be deemed guilty of a misdemeanor, and upon conviction thereof in any court of competent jurisdiction shall be fined in any sum not less than fifty dollars nor more than five thousand dollars, exclusive of court costs; *provided,* that in case of state institutions, municipalities, towns, incorporated towns and cities, when, owing to the magnitude of the work, immediate correction of the evil is impracticable, then in such cases the authorities shall adopt all new work,

and as rapidly as possible reconstruct the old system of drainage, sewerage, and so as to conform with the provisions of this act; *and provided further,* that all such new and reconstructed systems shall be completed within four years from the date of passage hereof." * * * (Stats. 1903, p. 214.)

In 1907 the legislature amended the act by inserting in section 1 thereof the following:

"*Provided,* that in case of state institutions, municipalities, towns, incorporated towns or cities, when, owing to the magnitude of the work, immediate correction of the evil is impracticable, then in such cases the authorities shall adopt all new work, and as rapidly as possible reconstruct the old systems of drainage sewerage so as to conform with the provisions of this act; *and provided further,* that all such new and reconstructed systems shall be completed before March 20, 1911." * * * (Stats. 1907, p. 104.)

The legislature of 1909 again amended the act by extending the time within which the reconstructed sewerage systems should be completed to March 20, 1913. (Stats. 1909, p. 306.)

The legislature of 1911 again amended the act by extending the time within which the reconstructed sewerage systems should be completed to March 20, 1915. (Stats. 1911, p. 56.)

The legislature of 1913 again amended the act by extending the time within which the reconstructed sewerage systems should be completed to January 1, 1916. (Stats. 1913, p. 405.)

The legislature of 1915 amended the act by extending the time within which the reconstructed sewerage systems should be completed to January 1, 1918. (Stats. 1915, p. 361.)

The legislature of 1917 passed two separate and distinct acts, each of which had to do with the subject of the removal of sewage and other poisonous and deleterious substances from the waters of the lakes, rivers,

streams, and ditches of the state. The act of March 8, 1917 (Stats. 1917, p. 51) made it the duty of the attorney-general, with the consent of the governor, to commence such action or actions, suit or suits against any and all persons, municipalities, towns, cities, corporations, or associations as may be necessary to prevent or restrain the pollution of any public stream or streams running in, into or through the State of Nevada, whether the source of pollution be within or without the State of Nevada.

The act of March 27, 1917 (Stats. 1917, p. 412) repealed the act of March 20, 1903, with its several amendments, and made no provision for time during which cities or towns should prepare for or provide for the removal of sewage or the like. By the latter act it is provided, *inter alia:*

"Any person or persons, firm, company, corporation or association, city or town who shall deposit, or who shall permit or allow any person or persons in their employ or under their control, management or direction to deposit in any of the waters of the lakes, rivers, streams or ditches in or running into or through the State of Nevada, or cause to be washed or infiltered into any of said waters, or place or deposit where the same may be washed or infiltered into any of said waters, any sawdust, pulp, oils, rubbish, filth, or poisonous or deleterious substance or substances which affects the health of persons, fish, or live stock, or renders said waters unpalatable or distasteful, shall be deemed guilty of a misdemeanor and upon conviction thereof in any court of competent jurisdiction shall be fined in a sum of not less than fifty ($50) dollars, nor more than five hundred ($500) dollars, exclusive of court costs."

Here we find successive legislative acts bearing upon and having to do with the subject of the removal of sewage and other deleterious and poisonous substances from the public waters of the state. The several session acts amending the statute of 1903 extended the time

during which the work of reforming and reconstructing sewerage systems of the cities affected should be accomplished.

It is admitted that the city of Reno, situated as it is upon the Truckee River, is one of the cities directly affected by the act of 1903 and its several amendments.

The legislature of 1915, evidently with a view to the accomplishment of the matter sought to be brought about, not only fixed the time at which the city of Reno should have its sewage removed from the Truckee River, but, to insure the accomplishment of this object, amended a section of the city charter, and therein directed the city council of the city of Reno to segregate a portion of the tax raised for general purposes and place the same in a special fund to be used for that purpose, "and for no other purpose."

The language of subdivision 3 of section 10 of article 12 of the city charter, as amended in 1915, is direct, positive, explicit. It requires 15 per cent of the taxes imposed for general purposes and levied upon all real and personal property within the city of Reno to be set aside in a special fund to provide for a special thing, to wit, a sewage-disposal plant or system for the city, and directed that the money thus raised and funded should be used for "no other purpose." If the legislature of 1917 had been less emphatic in its enactments requiring cities of the class of which Reno is admitted to be one to remove their sewage from the public waters, the contention of petitioner here might be received with more favor.

Mr. Sutherland, in his work on Statutory Construction, tells us, and the text of the learned author is supported by splendid authority, that:

"Subsequent legislation repeals previous inconsistent legislation, whether it expressly declares such repeal or not. In the nature of things it would be so, not only on the theory of intention, but because contradictions cannot stand together. The intention to repeal, however, will not be presumed, nor the effect of repeal

admitted unless the inconsistency is unavoidable, and only to the extent of the repugnance. Implied repeals are not favored. One statute is not repugnant to another unless they relate to the same subject and are enacted for the same purpose. When there is a difference in the whole purview of two statutes apparently relating to the same subject, the former is not repealed." (Sutherland on Statutory Construction, sec. 138, p. 180.)

Keeping this rule in mind, let us examine the amendment of 1915 and compare it with that of 1917.

The amended charter of 1915, carrying out a specific and consistent policy, created by plain and unmistakable language a specific fund, and with the emphasis of plain language limited the use and purpose of the money therein. The purview of that statute remained intact and the purpose of the fund created remained uppermost even after the enactment of the 1917 statute.

The act of 1915 amending the city charter of the city of Reno, creating, as it did, a special fund, must be regarded as existing cooperatively with the act of the same legislature extending the time within which the thing for which this special fund was created should be accomplished. Moveover, it must be regarded as a part of the general plan adopted by the legislature for the accomplishment of a given purpose and policy. In view of the fact that the legislature of this state continued its policy of requiring sewage and deleterious matter to be removed from the public streams as evidenced by the acts of 1917, we would not be justified in saying that by an implication found in another act of the same legislature it intended to take away the means whereby the thing sought to be made effective could be accomplished. In view of the policy of our legislature written into the several session acts from 1903 until the present time, and in view of the absence of specific legislation bearing upon a fund directly created for the purpose of carrying out this policy, it would, in our judgment, do violence to every rule of statutory construction to say that by implication the legislature did the idle thing of

directing a city to remove its sewage from a public stream, directing the attorney-general of the state to commence an action for the accomplishment of such a result, and at the same time and in the same session pass an act taking from the city the means whereby such a result might be accomplished and such a suit avoided.

The effects and consequences of a statute must be considered and weighed in its construction where the precise intent is not plain or where the language is obscure or ambiguous. We must not lose sight of the object sought to be accomplished by the fund specifically created by the amendment of 1915. If in 1917 the legislature had intimated that it had abandoned its persistent policy in furtherance of which this fund was created, then indeed there might be some room for declaring that the legislature intended to do away with this fund and permit the money to be devoted to another use.

"The legislature," says Mr. Sutherland, "are presumed to know existing statutes, and the state of the law, relating to the subjects with which they deal. Hence that they would expressly abrogate any prior statutes which are intended to be repealed by new legislation. Where there is no express repeal, none is deemed to be intended, unless there is such an inconsistency as precludes this assumption; then it yields only to the extent of the conflict. Regard must be had to all the parts of a statute, and to the other concurrent legislation *in pari materia;* and the whole should, if possible, be made to harmonize; and if the sense be doubtful, such construction should be given, if it can be, as will not conflict with the general principles of law, which it may be assumed the legislature would not intend to disregard or change." (Sutherland on Statutory Construction, sec. 287, p. 371.)

See *State* v. *Donnelly,* 20 Nev. 214, 19 Pac. 680; *In Re Walley's Estate,* 11 Nev. 260.

In the case of *Abel* v. *Eggers,* 36 Nev. 381, we said:

"It is also a well-recognized principle that statutes relating to the same matter which can stand together

should be construed so as to make each effective. (*State v. Donnelly*, 20 Nev. 214; *State v. Rogers*, 10 Nev. 319; *State v. Hoover*, 5 Nev. 141.) In the interpretation of statutes the courts so construe them as to carry out the manifest purpose of the legislature, and sometimes this has been done in opposition to the words of the act. (*Gibson v. Mason*, 5 Nev. 283.)"

The legislature created the fund here in question by specific terms, using language certain, positive, unmistakable. The legislature of 1917 discontinued the source from which this special fund derived its moneys. Nowhere in the amendatory act of 1917 does the legislature specifically or directly declare that the moneys now in this special fund shall be interfered with. The fund in which this money was held is not mentioned. Does a repeal of the diversion of revenue dispose of moneys already collected and held in special assignment for a specially legislated purpose? The legislature of 1915 provided for the collection of this money, for its diversion, and for its being "set aside in a special fund to provide for a sewage-disposal plant, etc." Did the legislature of 1917 at any place in their enactments say that this money theretofore collected and "set aside in a special fund to provide for a sewage-disposal plant" might be transferred to the general fund of the city? Did the legislature of 1917 anywhere mention this specially created sewage-disposal fund or the moneys therein contained? The answer to this must be in the negative. How then can the prevailing opinion find comfort in the language, where does it find support for the expression, "the proviso, therefore, is an affirmative declaration to the effect that the city may transfer the fund in question to the general fund"? The most that can be said of the language, and indeed the most that is claimed by the argument of counsel, is that by implication the legislature referred to this fund.

The prevailing opinion loses its force because it rests in its entirety on a statement unfounded, unsupported. The legislature nowhere made an *affirmative declaration* as to this specific fund; and even if it were admitted by

the pleadings that the "language of the proviso can relate only to the special fund authorized by the act of 1915," such admission, if it could be found, would make an *affirmative declaration* out of that which is in fact only language of indirection and uncertainty.

The matter before is is not one which deals primarily with the question of repeal. It is rather one which calls for the consideration of the effect of an independent enactment by way of *proviso.* The amendatory statute of 1917 deals *in futuro,* not *in præsenti.* It does away with the future segregation of revenue to the special fund. The special fund, as it existed at the time of the enactment of the amendatory statute, is not mentioned, and reference to it can only be presumed by implication. If the legislative policy and contemporaneous legislation refute the presumption that the legislature by the proviso here in question intended to affect the special fund previously created for sewage-disposal purposes, then it is our duty to so hold. The very fact that the legislature of 1917 so framed the pollution statute heretofore quoted as to declare by specific language that—

"Any  *  ·  *   *   city or town who shall deposit, or who shall permit or allow any person or persons in their employ or under their control,  *  *  *  to deposit in any of the waters  *  *  *  of the rivers  *  *  *  any  *  *  * filth  *  *  *  which affects the health of persons, fish or live stock, or renders said waters unpalatable or distasteful, shall be deemed guilty of a misdemeanor; *  *  *  "

—the very fact that this legislation was enacted without giving the cities and towns thereby affected time to adjust their sewerage systems as had been done by previous legislatures, speaks emphatically as to the policy of the legislature of 1917 on the question of sewage disposal. This of itself refutes the idea that the legislature intended to take away the funds already segregated by special legislation for the special purpose of sewage disposal. Does the legislature make a mandatory order as to sewage disposal and at the same time

take away from the city the specially provided means whereby that order could be complied with? If it had done this by specific legislation, using plain and unmistakable language as to the transfer of the fund in question, it would be an inconsistent thing, to say the least. But where implication only is relied on, we are not allowed to indulge in other than the assumption of consistency by the legislative branch of our government. Was the legislature of 1917 guilty of indulging in contradictory policies? Did it provide for the bringing of suits by the attorney-general to prohibit stream pollution and at the same time authorize doing away with a special fund specially segregated for the special purpose of sewage disposal and which was held by a city for that and *for no other purpose?*

Again, did the repeal of the act of 1915 by a subsequent legislature repeal by implication or otherwise the pollution statute, to comply with which this special fund was alone usable? The only answer to the latter is that the legislature of 1917 made the policy against stream pollution more emphatic and peremptory. It thereby made the use and purpose to which this special fund was alone applicable one of immediate existence rather than of future emergency, one which required the immediate application of the fund to the special purpose for which it was specially created. Was this fund as it stood sufficient to accomplish the thing for which it was created? We do not know. Was the money already in the fund ample to complete a system of sewage disposal already advanced, and hence in the judgment of the legislature the segregation of revenue provided for by the former legislature should be discontinued? We are not advised. What we do know is that the purpose to be accomplished by the fund was a thing reenunciated by the legislature of 1917.

The fund existed. The object for which the fund was specially created was still present and unaccomplished. Contemporaneous legislation required this special object to be accomplished. If there is any presumption to be

indulged in, it must be resolved by the court on the side of consistency, and we are bound to construe the language of the legislature, in view of the failure of that body to specially designate the fund, to have no reference to this special sewage-disposal fund which was declared by the legislature that created it as one expendable for no other purpose.

The assertion of the prevailing opinion as to cities being instrumentalities of the state is elementary; that question is not before us. We are asked here to construe an indirect, uncertain proviso which fails to mention the specific fund which respondents in their official capacity refuse to transfer. If the special sewage-disposal fund were specifically mentioned in the proviso, this controversy, I apprehend, would not be here. Moreover, contemporaneous legislation supports the assumption that, if the proviso found in the statute of 1917 had specifically named the special sewage-disposal fund of the city of Reno, it would not be found today upon the statute books, and we would not have been called upon to construe or interpret. The prevailing opinion says:

"It is obvious that the restrictions imposed by the amendatory act of 1915 are retained in the amendatory act of 1917, except the requirements that 15 per cent of the tax levied and collected for general purposes shall be set aside in a special fund to provide for a sewage-disposal plant or system for the city, which is omitted."

What has this to do with the thing already existent? What has this to do with the money already segregated and funded in accordance with previous law? Did the mere discontinuance of the segregation of 15 per cent of the tax levy in any way affect the fund already established? True, the fund would not grow in amount after the passage of the statute of 1917, but this in no wise affected the money already in the fund collected at a former time. If the legislature of 1917 had intended to provide for the diversion of this fund, why did it not mention such special sewage-disposal fund? Are we not bound, in view of contemporaneous legislation, to construe

the absence of such specific mention or designation as the very strongest manifestation in favor of the legislative intent being to leave this sewage-disposal fund to be devoted to the purpose for which it was created? The prevailing opinion says:

"It is, no doubt, a well-settled rule in the construction of statutes that, where a statute provides (as in this case) that a certain former statute 'is hereby amended so as to read as follows,' any provision of such former statute which is not found in the new statute is repealed."

Admitting all this, what has it to do with the situation? The statute of 1917 admittedly repealed the statute which provided for the diversion of 15 per cent of the tax levy. Hence that diversion was to be no longer made by the financial department of the city government. If the legislature of 1917 had in specific language discontinued the segregation of revenue to the state sinking fund for the redemption of outstanding state bonds, would that of itself authorize the state controller to transfer moneys already held in such sinking fund to the general fund of the state? The language of the proviso is:

"That all moneys now held in any special fund not herein provided for may be transferred to the general fund of the city."

What word, I ask, in this proviso conveys the sense of "affirmative declaration"? What word in this proviso points specifically to the fund in question? Shall we read something into this statute not specifically found there? My understanding was that we were called upon to construe a statute, not to legislate.

The acts of the respondents in their official capacity as city auditor and city treasurer in segregating 15 per cent of the tax collected pursuant to the 1915 statute was not one involving discretion on their part, but rather was it expressly commanded by law. The creation of the fund was mandatory, and was directed for a given and specific purpose. That purpose was of a public nature, one in which the entire state was interested. It was a purpose growing out of a prescribed and long-continued policy.

This policy was made more emphatic by the acts of the legislature of 1917. The purpose for which this special fund had been created has never been accomplished. No other means of accomplishing this purpose has been expressly provided. These are the salient facts which refute the idea that the legislature of 1917 intended to dissipate this fund. The construction of the sewage-disposal plant was not a matter in which the city alone was interested. The state, by whose repeated mandate the pollution of the river was declared obnoxious, was an interested party. The state had directed the segregation of this money into a special fund to be devoted to the eradication of the evil. It would seem to require more than a mere omission of the mention of this fund in the statute of 1917 to induce the conclusion that the legislature intended the fund to be devoted to another purpose. This is especially true in view of the failure of the legislature of 1917 to make even the slightest mention of this special fund. The state, and not the city, created this fund. The state, and not the city, declared the object to which it should be devoted. The state is a party interested in this fund so long as the object is unaccomplished. This being true, it would, in view of the policy of the state, seem to require more than mere words of indirection to warrant a conclusion which would authorize the application of this fund to another purpose.

In the concurring opinion of Mr. Justice COLEMAN, I find the query:

"In other words, if, notwithstanding the policy of the state as to preventing the pollution of the public streams, the legislature repealed the provision in the act of 1915 providing for the creation of the fund for the construction of the sewage-disposal plant, why should that general policy enter into consideration in determining the force and effect of the portion of the amendatory act of 1917 which empowers the city to transfer the special fund to the general fund?"

It is evident, from a reading of both the prevailing and concurring opinions, that my learned associates fail to

distinguish between that principle of law which holds statutory provisions to be *in pari materia* and that cardinal principle, elementary in statutory construction, which requires a court in its attempt to arrive at the intention of the legislature to look to contemporaneous acts. It is not a question here as to whether the statutes relative to stream pollution and that relative to the creation or elimination of this particular fund are *in pari materia*. We are construing a statute, and we have a right and it is our duty to perform this judicial act guided by cardinal rules and principles laid down by text writers and authorities applicable to the question. The language of the proviso in the statute under consideration has been treated in both the prevailing and concurring opinions as though it were specific, direct, positive, when as a matter of fact the most that is contended for it by the brief and argument of most able counsel is that it is inferential, implicative.

The writ should have been denied.